## MURPHY–BOLANZ LAND & LOAN CO. et al. v. McKIBBEN. (No. 1640.)

(Court of Civil Appeals of Texas. Amarillo. March 31, 1920. Rehearing Denied May 5, 1920.)

1. **Trusts** ⬦231(2)—**Representation of vendor in sale to beneficiary is breach of trust.**

Where trustees to invest money for plaintiff acted as agents for vendor who sold property to plaintiff and collected a commission from the vendor, they were guilty of a breach of trust for which they are liable.

2. **Trusts** ⬦218(1)—**Ordinarily damages for breach of trust in purchase of land is difference between price and value.**

Ordinarily, the measure of damages for breach of faith by trustee in purchasing land for the beneficiary is the difference between the value of the land at the time of the purchase and the contract price.

3. **Trusts** ⬦233—**Measure for misappropriation of trust funds is value at time of trial.**

The measure of damages for the misappropriation or misapplication of trust funds by the trustee, where the fund is beyond reach, is its value at the time of the trial; that is, the sum misapplied with legal interest from the date of misappropriation.

---

⬦For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**4. Trusts &#9758;231(2)—Trustee individually interested held liable for amount invested and lost.**

Where trustees induced the beneficiary to accept a purchase with trust funds of property for whose owner they were agents on commission, and represented to the beneficiary that they could sell the property before the deferred payments became due, which they knew she could not meet, but they failed to make the resale and plaintiff lost the property, the trustees were liable for the amount of trust funds invested in the property, not merely for the difference between value and contract price and the commission they received from the vendor.

**5. Trusts &#9758;231(1)—Trustee must make no profit from trust funds.**

A trustee must act in all matters for the beneficiary, and is not permitted to manage the trust property so as to gain any advantage, directly or indirectly, beyond his lawful commission, and for breach of such duty the beneficiary is entitled to claim all gains and to charge the trustee with all losses.

**6. Trusts &#9758;237—Acceptance of property without full knowledge not a ratification of misapplication.**

The acceptance by the beneficiary of property purchased with trust funds in breach of trustees' duty is not a ratification of trustees' act, unless it was made after full knowledge of all the facts.

**7. Trusts &#9758;179—Beneficiary sui juris may rely on trustee.**

That the beneficiary of a trust was sui juris does not deprive her of her right to rely on the honesty and fair dealing of trustees, or to recover relief when the trust relationship is abused.

**8. Trusts &#9758;371(1)—Petition alleging trust to invest and reinvest need not allege specified sum.**

A petition alleging that plaintiff deposited her money with defendants as trustees to invest and reinvest it for her, and seeking damages for a misapplication of a part of the funds, need not allege that any specified amount was deposited.

**9. Trusts &#9758;373 — Instruction defining trusts held not abstract.**

Where the facts raised the issue of appointing defendants as agents or trustees to invest money deposited with them by plaintiff, which partakes more of the nature of a trust, an instruction defining a trust was not erroneous, as not applicable to the facts or calculated to mislead the jury.

**10. Trusts &#9758;13—Use of money and commission sufficient consideration for trust contract.**

The right to use money deposited with defendants in trust and to receive commissions for its investment and reinvestment is sufficient consideration to sustain the trust contract.

Appeal from District Court, Dallas County; Kenneth Foree, Judge.

Action by Mrs. Eugenia Lomax McKibben against the Murphy-Bolanz Land & Loan Company and another. Judgment for plaintiff, and defendants appeal. Affirmed.

Read, Lowrance & Bates, of Dallas, for appellants.

Albert Walker and O. F. Wencker, both of Dallas, for appellee.

HUFF, C. J. The appellee, Eugenia Lomax McKibben, sued the Murphy-Bolanz Land & Loan Company and J. H. Powers, alleging that she was an unmarried woman and that during the month of December, 1910, she entered into a contract with J. H. Powers, in his personal capacity and also as president of the company, and for the company, whereby she was to deposit with the defendants' $5,000 or $6,000, and that they agreed to invest this money for her so that it would make her a great deal of money and would look after it, and that she need give it no further attention; that she told them she was without experience and they told her she need not worry about the matter and would make her money; that the consideration to defendants for such promise was to be the use of plaintiff's money and commissions that should inure to the defendants from plaintiff on account of such investments of her money. She alleges that Powers had been known by her for many years and was related to her by marriage, and because of his reputation as to his personal capacity and as an officer of the company she accepted his proposition and placed with him the money, with the full and distinct understanding that defendants would look after her business and administer it as a trust fund and would invest her money in property, and that they guaranteed to make her a considerable sum of money and assured her that none of it would be lost. She alleges that during the year 1913, while so employed in the trust, defendants fraudulently and knowingly, and with the intent to defraud her, purchased out of this trust fund a lot situated in the city of Dallas, and on the 13th day of June, 1913, caused J. W. Youngblood to convey to her said lot. Just a day previous thereto Mrs. Lively sold the property to Youngblood for the sum of $11,000, and for the purpose of defrauding plaintiff out of the sum of $2,400 they purchased the property from Mrs. Lively and sold it to Youngblood, who was merely a figurehead and had no actual connection with the transaction. She alleges that they sold the property from Youngblood to her at $12,-500; that this transaction from Mrs. Lively to Youngblood was a sham and subterfuge. She also alleges that she had no experience, and relied upon the representations of Powers in leaving the money with him to administer upon the trust aforesaid. She alleges, in effect, that on the 13th day of June, 1913,

the defendants caused Youngblood to make her the deed, but as a matter of fact the sale was made by E. W. Rose or Dabney Day, who were using Youngblood for their convenience, and that Powers and the company were acting as their agents in making the sale to her and that they received a commission therefor in the sum of $250; that she did not discover that the defendants were representing Rose, Day, and Youngblood as their agents in making the sale of the above-described property to her, through themselves as their agents, until June 26, 1916, and that they were disloyal to their trust to her and put themselves in a relation antagonistic to her interest by representing the seller while they were representing her as purchaser; and that they accepted and received and were paid a commission by Day and others as their agent in making the sale. She says, by reason of the disloyal conduct of the defendants in paying out the $2,400 cash on the sale and interest of $800 on prior notes secured by the property conveyed to her, that she had been damaged in said amounts. She alleges also that one Frank Dunlap, acting as trustee under deed of trust executed by her and who was acting for the defendant company, with full knowledge of the facts in this case, foreclosed the deed of trust in this case against the property conveyed to her by Youngblood, and that said property was sold to Youngblood at a trustee's sale and on the same day transferred by him to Dabney Day and E. W. Rose. She also alleged that at the time of and before the investment of the $2,-400 each of the defendants knew that she had no other money or funds of any character or kind, and they each knew she would not be able to meet the deferred payments mentioned in the deed from Youngblood to her; and that she told them at and before the time when they used and invested her $2,400 that she would not consent to invest same in the property so conveyed unless said investment would make her money, and unless said property could be sold in time to take care of the deferred payments and to enable her to make a profit and not sustain a loss; that the defendants told her at and before that time that they would sell said property within two months and would sell same for more than she was paying for it and that she would not lose anything by the investment, and that, relying upon these promises, representations, and statements made by defendants and each of them, she permitted defendants to make said investment of her money in the sum of $2,400. She also seeks a recovery of the $250 paid the defendants as commission for making the sale paid them by Day and Rose, praying for judgment for the total sum of $3,450, with interest, etc.

The defendants answered by exceptions, general denial, and specially denied making the sale from Mrs. Lively to Youngblood or receiving any commission for that sale, alleging substantially that the sale had been made without their knowledge and a contract therefor drawn some time previous thereto, and that the deed was only executed in compliance with the contract. They alleged that she knew that they were representing and receiving a compensation from Youngblood, Day, and Rose in making the sale to her, and also alleged that she accepted the deed, made the notes, executed the deed of trust to secure their payment, took possession of the property, and collected the rents for two years, and they also denied the trust relation set up.

The jury, in answer to special issues submitted by the court, found that defendants were agents of the plaintiff in the transaction wherein J. W. Youngblood conveyed to plaintiff the property in question. They also answer that the defendants were the trustees of the plaintiff in that transaction. To issue No. 3, "Did the plaintiff know, at the time of the transaction wherein J. W. Youngblood conveyed to her the property mentioned in the deed in evidence from J. W. Youngblood to plaintiffs, that defendants represented E. W. Rose and J. Dabney Day in the transaction?" the jury answered, "No." At the request of plaintiff the following issue was asked: "Did plaintiff, Mrs. E. L. McKibben, know that defendant J. H. Powers, Murphy-Bolanz Land & Loan Company, were to receive a commission from J. D. Day and E. W. Rose on the sale of the lot on Commerce street at the time she purchased said lot?" The jury answered, "No."

The defendants asked the following issues, which we give, together with the jury's answers:

"Did plaintiff, Mrs. E. L. McKibben, during the month of December, 1910, and on or about the 6th day of December, 1910, enter into a verbal agreement with the defendant J. H. Powers, in his personal capacity and also as president of the Murphy-Bolanz Land & Loan Company, for the Murphy-Bolanz Land & Loan Company, whereby the said plaintiff was to deposit with the defendants $5,000 or $6,000, and did said defendant J. H. Powers, for himself and for the Murphy-Bolanz Land & Loan Company, promise and agree that he would invest this money for said plaintiff so that it would make her a great deal of money? Answer Yes or No. Answer: Yes.

"Did the plaintiff, Mrs. E. L. McKibben, during the month of December, 1910, and on or about December 6, 1910, make a deposit of $5,000 or $6,000 with the defendant J. H. Powers, or Murphy-Bolanz Land & Loan Company, or either of them? Answer Yes or No. Answer: Yes.

"Did the plaintiff, Mrs. E. L. McKibben, make a deposit of $5,000 or $6,000 with the defendant J. H. Powers, or the Murphy-Bolanz Land & Loan Company, or either of them? Answer Yes or No. Answer: Yes.

"Did the plaintiff, Mrs. E. L. McKibben, make

a deposit of $5,000 or $6,000 with the defendants, J. H. Powers, Murphy-Bolanz Land & Loan Company, or either of them, for the purpose of making investments for her without her approval?  Answer Yes or No.  Answer: Yes.

"Did the defendants, J. H. Powers and Murphy-Bolanz Land & Loan Company, or either of them, submit to the plaintiff, Mrs. E. L. McKibben, for her approval or rejection, before making the investment for purchase of the lot on Elm street and the purchase of the lot on Commerce street?  Answer Yes or No.  Answer: Yes.

"Did the plaintiff, Mrs. E. L. McKibben, authorize the defendants, J. H. Powers and Murphy-Bolanz Land & Loan Company, or either of them, to make any investment for her without her approval?  Answer Yes or No.  Answer: Yes.

"What was the reasonable market value of the lot on Commerce street on or about June 13, 1913?  Answer: $11,500.

"Did the defendants, J. H. Powers and Murphy-Bolanz Land & Loan Company, or either of them, act as agents for Mrs. Laura Lively in the sale of the lot on Commerce street to J. W. Youngblood?  Answer Yes or No.  Answer: No.

"Did the plaintiff, Mrs. E. L. McKibben, have an opportunity to sell the lot on Commerce street for a profit after she purchased same?  Answer: No."

The testimony in this case shows that shortly after or during December, 1910, the appellants, acting as agents for other parties sold to the appellee and her brother a lot on Elm street, in the city of Dallas, each of the grantees therein having a half interest, and subsequently this lot was sold at a gross profit of about $2,000, the appellants charging appellee and her brother a commission of $500 for making that sale, and they also charged the vendor a commission in selling to appellee and her brother, $500.  The evidence also indicates that Powers had an interest in the Elm street property at the time it was sold to the appellee and her brother.  The property involved in this case is the lot on Commerce street.  The record evidence shows, in addition to the $2,400 cash paid, that the appellee executed two notes for the sum of $1,000 each, due in one and two years, and in addition that there was a lien on the lot in favor of Mrs. Lively to secure the notes executed by Youngblood, and also another lien of something over $5,000 that was secured by a deed of trust on the property.  The total consideration for the lot paid by appellee was $12,500.  When the first note executed by appellee fell due she was unable to pay it and procured an extension of a year by entering into a contract with Day and Rose. At the expiration of that time, at the request of the holders of the note, the deed of trust was foreclosed at trustee's sale; Dunlap being substituted as substitute trustee for the named trustee Murphy, both of whom were members of the appellant company. Dunlap, as substitute trustee, on March 7, 1916, sold the land to J. W. Youngblood. J. W. Youngblood conveyed to Rose and Day on March 11, 1916, the property in question. Mrs. McKibben and her brother testified substantially that at the time the sale was made to her she objected on the ground that she did not have sufficient money to meet the deferred notes, and that unless she could sell the property she would likely lose the land, and that the appellants assured her that they would sell the land within a short time and that she would not lose any money. Without looking into the matter further, she accepted what they stated and signed the papers presented to her for her signature. There is some evidence with reference to her effort to pay the interest on the notes given by her as well as the notes that had been executed against the land previous to her purchase, but the court upon motion rendered judgment against the appellants for the sum of $2,400, with interest.

The appellants' first assignment is that the court erred in overruling defendant's motion for judgment in the sum of $250, with interest at 6 per cent. from June 13, 1913, in favor of plaintiff; and also assignment No. 2, that the court erred in sustaining the motion for plaintiff to enter judgment in the sum of $2,400, with interest thereon from June 13, 1913. It is asserted in the assignment that this was error, because it is not sustained by the findings of the jury, because the jury found that appellants submitted to plaintiff for her approval or rejection before making the investment the purchase of the lot on Commerce street, and that the evidence showed that said plaintiff was sui juris at the time of the purchase of the lot, and because the uncontradicted evidence showed that the market value of the lot on Commerce street on June 13, 1913, was $12,500; that there was no evidence to support the finding of the jury that it was $11,500. They present propositions to the effect that the measure of damages for fraudulent representation inducing the purchase of property is the difference, if any, between the value of the property at the time of purchase and the amount paid for it, etc. The appellee complains of these assignments and objects to them because they are not briefed in accordance with the rules of the statute and that it is impossible to follow the brief of appellant. The appellants urge principally the question of the measure of damages, and we have concluded to consider these assignments on that point.

[1, 2] If, as found by the jury, appellants were the trustees for appellee to invest her money and to use their judgment and discretion therein, they then owed to her the utmost good faith in doing so. If while they were purchasing the land for her they were also representing the vendor, and were paid a commission for their services therein by the vendor, they were guilty of a breach of trust

for which they are liable. In this case, however, the measure of damages, or the compensation to be awarded, is more difficult to determine. Ordinarily, we think the rule of damages would be as contended by appellants; that is, the difference between the value of the land at the time of the sale and the contract price. The question raised by the assignments and proposition, together with the evidence, is whether the court was justified in finding that the trust required not only the investment, but that the trustee was required to also see that the trust funds should not be lost by such investment. The jury found that the agreement was that the investment should be so made as to make appellee money on the investment. The facts are uncontroverted that she had no money or property except that intrusted to appellant and that when this particular contract was made she had only about $3,000, and of this sum $2,400 was paid on the trade. The appellants knew, if this property was not resold before the notes executed for the deferred payments fell due, that under the deed of trust, of which one member of the corporation was the named trustee therein, all her interest would probably be sold and lost. This matter was called to the attention of appellants at the time of the transaction, and appellants again assured appellee that they could and would resell the property without loss to her before her notes were due. She relied upon this promise and signed the necessary papers, relying upon this assurance of her trustees. It was their honest judgment that she was trusting when she placed the money with them and when the deed was made to her. She did not know that the appellants were using this trust to further their own selfish purposes and ends, as established by the findings of the jury.

[3-5] It has been held by our Supreme Court that, in cases where the trustee has wrongfully purchased property in his own name and thereafter placed it beyond the reach of the cestui que trust, the measure of damages, where the suit is for compensation, is the value of the property at the date of trial, and not the value when the trustee sold it. Boothe v. Fiest, 80 Tex. 141, 15 S. W. 799; McCord v. Nabours, 101 Tex. 494, 109 S. W. 917, 111 S. W. 144; Richardson v. Hutchins, 68 Tex. 81, 3 S. W. 276. If the trustee should appropriate or misapply the trust funds, there could be no question, we take it, as to the right of the beneficiary to recover the fund, or, if beyond reach, the right as compensation to recover its value at the time of the trial, which in this instance would be the sum so misapplied, with legal interest from the date of its wrongful appropriation. The trustees in this instance were not intrusted to make a permanent investment, but to use the money to buy and sell for a profit for the appellee. The appellee relied upon the judgment, fidelity, and honor of the appellants to perform this service. It may be if appellants' duty had ended with the purchase of the lot that the appellee should be charged with the value of the lot at the time of its purchase, and could only recover the difference between the value at that time and the contract price. If she, with knowledge of the wrong, accepted the property and entered into its use or benefit, this may have been a ratification. The case of Coffing v. Dodge, 167 Mass. 231, 45 N. E. 928, quoted by the appellants, would seem to be to that effect. But appellants' duty did not end with the purchase. They were to resell the property. It was in contemplation of the parties in their trust relation that there was to be a gain and not a loss in making the sale. In buying the lot with the trust funds, it therefore devolved upon appellants to use care and caution in the interest of the appellee, and also to deal fairly, honestly, and with strict fidelity to her interest, and not to represent an adverse interest or to buy or sell to subserve some selfish end of their own. If their conduct was such as to make the use of the money a misapplication of the funds, then she was entitled to recover the funds, or, if beyond her reach, the value of the funds lost at the time of the trial.

"Absolute and most scrupulous good faith is the very essence of the trustee's obligation. The first and principal duty arising from this fiduciary relation is to act in all matters for the benefit of the beneficiary. The trustee is not permitted to manage the affairs of the trust property so as to gain any advantage, directly or indirectly, for himself beyond his lawful commission. * * * It is equally imperative upon the trustee, in his dealings with trust property, not to use it in his own private business, not to make any incidental profits for himself in its management, and not to acquire any pecuniary gains from his fiduciary position. The beneficiary is entitled to claim all advantages actually gained and to hold the trustee chargeable for all losses in any way happening from a violation of his duty." Pomeroy's Equity Jurisprudence, vol. 3, §§ 1075, 1077, 1080.

Also volume 2, § 859, p. 2055 (4th Ed.); Hahl v. Kellogg, 42 Tex. Civ. App. 636, 94 S. W. 389; Boyd v. Jacobs, 6 Tex. Civ. App. 442, 7 Tex. Civ. App. 131, 25 S. W. 681.

We think the appellee, upon learning of the conduct of appellants, had the right to treat the sale as a misapplication of her money and in violation of the trust relationship. The jury found appellants sold her the lot for more than its value and for so doing they received a compensation from the vendor. Appellants evidently knew the appellee was without the means to pay the balance of the purchase money, and that she would inevitably lose the lot and all she had in it in default of the deferred notes. It is contended she accepted the rents on this property. The

evidence shows there was only a shack on the property, called a negro house in the record, and that the appellants collected the rents, which were small, and paid appellee only a portion of them. They assured her they could sell the property, and they alleged that they secured an offer of $1,000 profit to appellee, which she refused; but the jury found this was not true, and that she had no such offer, and the evidence is she could not sell it at a profit.

[6] It is argued by accepting the lot, etc., that this would amount to a ratification on her part and that the appellee cannot recover after the property had been sold to pay debts against it secured by the deed of trust. If she had elected, after full knowledge of her rights, to hold the property, or if she yet had the property, it may be she would have to tender it back before she could recover the money placed in it on account of the breach of trust by appellants.

"If, on the other hand, the original undue influence remains a continuation of the former transaction, or if the party wrongly supposes that the original contract or transaction is binding, or if he has not full knowledge of all the material facts of his own rights, no act of confirmation, however formal, is effectual. The voidable nature of the transaction is unaltered." Pomeroy on Equity (4th Ed.) vol. 2, § 964, p. 2090.

[7] It is asserted that at the time of the transaction in question appellee was sui juris. If the fiduciary relation existed as found by the jury, we do not believe we should say that appellee was not under the power of the appellants and that she was entirely free to act as of her own right. "Where antecedent fiduciary relation exists, a court of equity will presume confidence placed and influence exercised." Her dependent and fiduciary relation towards appellants, her pecuniary necessities and ignorance of matters to the kind for which appellants were appointed, rendered her dependent upon the honesty and fair dealing of the appellants, and courts will afford relief where such relationship is abused. Pomeroy's Equity Jurisprudence, vol. 2, § 591. The mere fact that she was called in to sign the notes and execute a deed of trust did not show that she was acting of her own free will and upon her own judgment. The evidence to the contrary is that she relied upon appellants to place her money where it would not be lost, as occurred in this case, and relied upon the assurance that the property was worth the money and would readily sell for that amount, and was induced thereby to sign the notes for the deferred payment and execute the deed of trust.

We do not think $250 paid appellants as commission in making the sale would be the compensation for the loss sustained by appellee. We believe, under the findings of the jury and under the evident findings of the trial court, which are supported by the evidence necessary to the judgment, that appellants' compensation was the money lost by the trustees and as decreed by the court in this case. Assignments 1 and 2 will be overruled.

We think there was no reversible error in overruling appellants' second special exception to appellee's petition, as complained of in the third assignment. What has heretofore been said will apply to this assignment.

[8] The fourth assignment will also be overruled. The appellee, as we conceive it, simply alleged a contract creating a trust in which appellants undertook to invest and reinvest appellee's money to the purpose of earning a profit. We do not think it was necessary to allege that any specific amount was in contemplation of the parties.

We think there was no reversible error in the charge of the court in which the issues as stated by the pleadings were summarized by the court. We think there was no undue emphasis placed on the allegation of fraud. The fifth assignment will be overruled.

[9] The sixth assignment complains of the trial court's definition of a trust. The propositions under this assignment are that it is error for the court to give the charge not applicable to the facts of the case and to give a charge calculated to mislead the jury. The facts, we think, raise the issue of appointing appellants agents and that appellee placed money with them, granting the power to invest it according to appellants' judgment. The relation so established is generally regarded as creating a trust relationship, and may be termed, perhaps, with propriety, either an agency contract or a trust. Pomeroy's Equity, vol. 2, § 909. We are inclined to think, under the facts of this case, the transaction between the parties partakes in the nature more of a trust as defined by the courts. City of Austin v. Cahill, 99 Tex. 172, 88 S. W. 547, 548, 89 S. W. 552; Kennedy v. Baker, 59 Tex. 156. At any rate, we do not think the charge was calculated to mislead or confuse the jury, and it appears to us to have been applicable to the case as made by the pleadings and the evidence.

The seventh assignment complains of the charge of the court on the burden of proof. The charge is applicable to the issues submitted to the jury. It is, perhaps, true that it does not apply to all the issues raised by the pleadings, but as to the issues actually submitted it was, we think, not objectionable or so erroneous as to require a reversal.

[10] The eighth assignment complains of the action of the court in overruling appellants' fifth special exception to the petition, to the effect that there was no consideration alleged for the contract. The petition alleges the consideration for the promise of appellants was for the use of her money and the commission that should accrue to them to

be paid by appellee. We think there was no reversible error in overruling the exception.

The ninth assignment is based on the action of the court in overruling the general exception to the petition. There is no reversible error in the action of the court thereon.

The tenth assignment will be overruled for the reasons stated in overruling the first and second assignments.

The judgment will be affirmed.