## HOUSTON NAT. EXCH. BANK OF HOUSTON v. SAPP et al.   (No. 6481.)*

(Court of Civil Appeals of Texas. Austin. Jan. 9, 1923. Dissenting Opinion, Jan. 12, 1923. On Rehearing, March 14, 1923. Dissenting Opinion on Motion for Rehearing, March 20, 1923. Further Rehearing Denied April 18, 1923.)

Contracts ⟨⚬⟩186(1)—Contractor held not entitled to trust fund from sale of stock.

Oil refining company secured subscriptions to its stock from citizens of a town on promise to erect a filling station in the town, with the understanding that the money received from the sale of such stock would not leave town but would be deposited in a certain bank there and kept there until the filling station was erected. Such funds were so deposited, and the filling station was erected by a contractor, who sued the refining company for the amount due him on the contract, garnisheeing the bank in which such funds were deposited. Such funds, represented by time certificate, had, at time of suit, been assigned for value by the refining company to the H. Bank; the certificate reciting, "This certificate is not subject to check and is not negotiable," but, the filling station not then having been erected, payment had been refused the H. Bank by the bank of deposit on account of the special agreement as to the purpose of the fund. *Held*, in the garnishment proceeding, that plaintiff could not recover the fund, he not being a beneficiary of the trust nor privy to the contract, and the parties to the trust not being joined in the suit, and the oil company's representations that plaintiff would be paid by the trust fund not being a legal assignment of such fund to him; hence the H. Bank was entitled to the fund.

Jenkins, J., dissenting.

Appeal from District Court, Falls County; Prentice Oltorf, Judge.

Action by T. M. Sapp against the Columbian Refining Company, the Planters' National Bank, garnishee, in which garnishee impleaded the Houston National Exchange Bank of Houston, claimant. Judgment for plaintiff, and the Houston National Exchange Bank appeals. Reversed and rendered.

Love, Wagner & Wagner, of Houston, for appellant.

### Findings of Fact.

JENKINS, J. The plaintiff, T. M. Sapp, sued out a writ of garnishment on September 30, 1920, ancillary to a suit filed on the same date against the Columbian Refining Company; the amount sued for by plaintiff being the sum of $2,000. Said writ of garnishment was directed to the Planters' National Bank of Rosebud, Tex., and was served on said bank on the day of issuance. Judgment was thereafter rendered in favor of plaintiff against Columbian Refining Company for $2,000, with interest from ———, which judgment remained unpaid at the time of trial of the garnishment proceedings, and at the time of entering judgment therein. Garnishee, Planters' National Bank, filed an answer on January 8, 1921, admitting that at the time of service of said writ there was on deposit at said bank to the credit of the Columbian Refining Company the sum of $2,000, represented by garnishee's certificate of deposit No. 511, dated July 8, 1920, and reciting that said amount was due three months after date and that said instrument was nonnegotiable. Garnishee impleaded Houston National Exchange Bank on an allegation that said bank claimed to hold said certificate of deposit as its property. Garnishee's answer showed no indebtedness or liability on its part other than as represented by said deposit of $2,000. Garnishee bank became the depository of the $2,000 under the following circumstances: The Columbian Refining Company proposed to erect a gasoline and oil filling station in the town of Rosebud, and desired to have citizens of that town become interested in said enterprise, representing to certain citizens of said town that if they would buy stock said company would erect the filling station in part with the money thus raised locally. It was understood and agreed between the agents of Columbian Refining Company and said Rosebud purchasers of stock that their money would all be used in the erection of said filling station, and that none of said money would leave said town, but would be deposited in the Planters' Na-

tional Bank and kept there until paid out for the construction of said filling station; that said agreement and arrangement was communicated to said bank, and something over $4,-000 was deposited in said bank in pursuance of said agreement. The bank issued its time certificate of deposit to Columbian Refining Company, and on representations of the latter's agent that the money would remain there some time before used in the construction of said filling station, the bank agreed to pay three per cent. interest on said deposit. Said certificate contained the statement: "This certificate is not subject to check and is not negotiable." Thereafter, and before maturity, and before maturity of said certificate of deposit, the Houston National Exchange Bank became the owner of said certificate of deposit by purchase of same for value from the Columbian Refining Company, said Houston Bank having no notice of any infirmity or interest in said fund in any third party except in so far as charged with notice by reason of the provision in said certificate above quoted. When said certificate became due, demand was made on the Planters' National Bank by Houston National Exchange Bank for payment of same, and payment was refused on account of the special agreement as to the purpose and disposition of said fund as above set forth. At this time the filling station had not been constructed. Thereafter, the Columbian Refining Company having purchased and shipped material to Rosebud for the construction of said station, a part of said fund was paid out and a new certificate for the balance of $8,000 issued in the name of the Columbian Refining Company, and forwarded to the Houston National Exchange Bank. Columbian Refining Company then entered into a contract with plaintiff, T. M. Sapp, for the construction of the said filling station, representing to him that the money was in the bank and he could get it; the money referred to being the balance on deposit in the Planters' National Bank. Plaintiff was told by Columbian Refining Company's agent that said money was in said bank and was put in there for the purpose of paying said contract price. Based upon said representations, plaintiff agreed to construct said filling station for the sum of $2,000, and did so in full compliance with his contract. Planters' National Bank understood that said fund when deposited was to be used for purchasing material and for the erection of said filling station. Upon completion of said station, plaintiff drew upon the Columbian Refining Company through the Planters' National Bank for the amount agreed to be paid him, and after Columbian Refining Company had failed to pay said draft, plaintiff entered suit and had the writ of garnishment served on said Planters' National Bank.

The foregoing findings of fact by the trial court are sustained by the evidence, and are adopted by us with this addition:

At the time the contract was entered into between the Columbian Refining Company and Sapp for the erection of the filling station, and the agent of the refining company represented to Sapp that the money to pay for erecting the station was in the bank and he could get it, the cashier and agent of the bank was present and assented to such statement. The agent of the refining company referred to the $2,000 balance paid by citizens of Rosebud to be held in trust by the bank for the purpose of paying for the erection of the filling station, and the cashier of the bank so understood.

The contract with Sapp for the erection of the filling station was made a few days prior to the issuance of the $2,000 certificate. The Houston Bank, at the time the $2,000 certificate was issued, knew of the agreement of the refining company to leave the money paid by the citizens of Rosebud for stock in said company, in the Rosebud Bank, and to use the same in payment for the construction of the filling station and for no other purpose.

Sapp had no knowledge of any claim of the Houston Bank on the money in the Rosebud Bank when he made the contract to erect the filling station.

The certificate for $2,000, involved in this appeal, read as follows:

"$2,000.00. July 8th, 1920. The Planters' National Bank, Rosebud, Texas. No. 511. This certifies that Columbian Refining Company has deposited in this bank two thousand dollars payable to the order of themselves in current funds on the return of this certificate properly indorsed, three months after date with interest at 3 per cent. per annum, for the time specified. This certificate is not subject to check and is not negotiable. [Signed] E. A. Donaldson, Cashier. No interest after maturity."

The original certificate for $4,100 was the same in all respects as the above certificate, except as to date, number, and amount.

E. A. Donaldson, cashier of the Rosebud National Bank, was one of the citizens of Rosebud who subscribed for stock in the Columbian Refining Company, under the agreement that the same should be deposited in said bank and expended in the construction of the filling station.

The court filed the following conclusions of law:

"Conclusions of Law.

"By virtue of the representations and agreement between the Columbian Refining Company and the persons from whom said fund was raised, the deposit of $2,000 in the Planters' National Bank became a trust fund, which was received by said bank as such and intended and agreed to be expended for the construction of the filling station, and the parties to said agreement had a right to demand that said fund be so applied, and the Houston National Exchange

Bank acquired said certificate of deposit subject to the carrying out of the said agreement. That the transaction between Columbian Refining Company and the plaintiff Sapp with reference to said fund amounted to an assignment of same to said plaintiff. I therefore conclude that the plaintiff is entitled to recover said $2,-000 fund and 'to recover of defendant Houston National Bank all costs herein."

Judgment was rendered in accordance with said conclusions of law.

### Opinion.

Appellee Sapp filed suit against the Columbian Refining Company for $2,000, the price agreed to be paid to him for erecting a filling station at Rosebud, Tex., and, at the same time, he sued out a writ of garnishment against the Rosebud Bank. He afterwards obtained judgment against the refining company for the amount sued for.

The Rosebud Bank answered, among other things, that it held $2,000 on deposit in the name of the refining company. Had it not further answered, of course, Sapp would have been entitled to judgment against the bank for that amount. However, the Rosebud Bank, in its answer, stated that the appellant was claiming the $2,000 by virtue of a certificate of deposit issued for the same; which certificate was No. 511, dated July 8, 1920, and reciting that said amount was due and payable three months after date, and that said instrument was nonnegotiable, and that the bank was indebted to whoever might be entitled to the $2,000, and was ready to pay the same when that issue was determined. It prayed that the appellant be made a party, and that the right to said $2,000 might be adjudicated, to the end that the garnishee should be fully protected by the judgment of the court.

The appellant filed an answer, in which it alleged that it was the owner of the certificate referred to; that it had purchased a like certificate for $4,100, issued to the refining company, paying therefor a valuable consideration, without notice other than was indicated by the certificate itself, and that subsequently $2,100 was paid on the certificate last mentioned, and a new certificate for the balance of $2,000 was issued, of which it was the owner; and prayed judgment against the Rosebud Bank for that amount.

Appellee answered the petition of the Houston Bank, alleging that the $2,000 was held in trust by the Rosebud Bank, by reason of the agreement referred to in the findings of fact and his contract with the refining company.

Thus it will be seen that while the suit against the Rosebud Bank was originally that as garnishee, under the pleadings upon which the parties went to trial, the suit became one in equity to determine the rights of Sapp and the Houston Bank to the $2,000 referred to.

The statement contained in the certificate of deposit that the same was nonnegotiable rendered it subject to all defenses against the Houston Bank that were available against the refining company. Subject to such defenses, the Houston Bank became the owner of the certificate of deposit.

Articles 583 and 584, Revised Statutes, read as follows:

"Art. 583. The obligee, or assignee, of any written instrument not negotiable by the law merchant may transfer to another, by assignment, all the interest he may have in the same.

"Art. 584. The assignee of any instrument mentioned in the preceding article may maintain an action thereon in his own name, but he shall allow every discount and defense against the same which it would have been subject to in the hands of any previous owner before notice of the assignment was given to the defendant; and in order to hold the assignor as surety * * * of the instrument the assignee shall use due diligence to collect the same."

See 2 R. C. L. 629, 630.

Such being the law, the inquiry is: What defenses could have been made by the maker of the certificate against the refining company, had the refining company drawn on the Rosebud Bank for this amount before erecting the filling station? We think it clear that the bank could have refused payment, upon the ground of its duty as trustees for those who had provided the fund. This is what the Rosebud Bank did when the Exchange Bank demanded payment of the $4,100 deposit. The filling station had not been begun at that time. Soon thereafter the refining company purchased, paid for, and delivered at Rosebud a lot of material to be used in the erection of the filling station. Thereupon the Rosebud Bank agreed to pay out of the fund on deposit with it the price of such material, the same being $2,100, and to issue another certificate to the refining company for the sum of $2,000, conditioned the same as the certificate for $4,100. In this transaction, the Rosebud Bank informed the Houston Bank that it did not consider it as having any interest in the certificate, and that its dealings were with the refining company only; and the certificate for $2,000 was issued to the refining company.

For the reasons stated, we hold that the appellant had no right to demand payment of the $4,100 certificate at the time the same matured. But the question here presented is: What were the rights of the Houston Bank to the $2,000, evidenced by the last certificate? The conditions at the time this suit was brought had changed to this extent, the filling station had been completed, and it is the contention of appellant that thereupon the trust relation of the bank as to the $2,000 ceased. We do not think so. It was, of course, the purpose of the subscribers to the refining company's stock to secure thereby the erec-

tion of the filling station in Rosebud, for the benefit that they as citizens of that town would derive from the erection and operation of such station. But, in order to secure the erection of the station, their agreement with the refining company was that this money should not only be deposited in the Rosebud Bank until the filling station was erected, but also that it should be used for that purpose only. The benefit derived by the subscribers to the stock from this agreement was that a contract for the erection of the station could be more readily secured, by reason of the fact that the money was on deposit in the bank to pay for the same.

It is contended that the appellee Sapp, not being a subscriber to the fund, was not in privity with the subscribers, and had no right to demand that the money be used in payment for the erection of the station. The agreement between the contributors to the fund, citizens of Rosebud, and the refining company, was for the benefit of the contractor for the erection of the filling station, whosoever he might be and when ascertained. When Sapp entered into his contract for the erection of the station, with the agreement between him, the refining company, and the bank, that he should be paid this $2,000 on deposit for erecting the station, he became the party contemplated by the original agreement, and was in privity with them, to the extent that he had 'the right to demand that the bank should comply with its duty as trustee, and pay this money to him. Of course, if the refining company had paid Sapp out of any other funds, his acceptance of the same would have put an end to his right to demand the $2,000, and any pro rata payment to him would, to that extent, have had the same effect, for he could not have demanded that he be paid twice for the same work.

So far, we have treated the relative rights of the parties to the $2,000 as if it stood on the same footing as the $4,100. Such, however, in our opinion, is not the case. When the appellant purchased the $4,100, it had no actual notice of the trust agreement hereinbefore referred to; but, by reason of the certificate being nonnegotiable, it took it subject to such trust. When the $4,100 certificate matured, it presented the same to the Rosebud Bank for payment. The Rosebud Bank refused to pay the same, and by telephone conversation and by correspondence, the appellant was informed as to the conditions upon which the $4,100 was deposited with the Rosebud Bank. Thereafter, with knowledge of such agreement, the $4,100 certificate was surrendered to the Rosebud Bank, and, in lieu thereof, it issued the $2,000 certificate, not to appellant which it refused to recognize as having any interest in the transaction, but to the refining company, and the same was made nonnegotiable. This $2,000 certificate was assigned by the refining company to the Houston Bank, in consideration of the payment made to it for the $4,100 certificate. The appellant being thus apprised of the conditions upon which the $2,000 certificate was issued, must be held to have accepted the same subject to such condition. That is to say it knew that this fund would be held by the Rosebud Bank until the filling station was erected, and that, if not otherwise paid for, the Rosebud Bank would pay the same to the contractor. By accepting the $2,000 certificate under these conditions, it became a party to the contract as to the conditions upon which the $2,000 was held by the Rosebud Bank; these conditions being that this $2,000 should be paid to Sapp, he having previously contracted to erect the station for that sum.

The record does not show that appellant knew, at the time this certificate was issued, that the contract had been let to Sapp to build the station for the sum of $2,000, but knowing that this sum was held for that purpose, we think it is chargeable with notice of the fact that the contract had been made with Sapp, by virtue of which he was entitled to the $2,000, unless he was otherwise paid for his work by the refining company. Appellant having accepted the $2,000 certificate under these conditions ought not now be heard to say that the bank should not be permitted to pay the sum represented by that certificate to the contractor. It is the duty of a trustee to discharge the thust imposed upon him. The trust, in the instant case, so imposed, was as between him and the contributors to the original fund, that it would hold such money in the bank and pay the same to whosoever might erect the filling station, and would not pay it to any one else. Its duty to Sapp, after the contract was made, by virtue of which the refining company agreed to pay him this $2,000, was to hold this money subject to the payment of the contract price to Sapp, and not to pay it out to any other person.

The trust issue raised by the pleadings and evidence in this case was properly determinable, although the suit began against the bank as garnishee. Ry. Co. v. McDonald, 53 Tex. 517; Ry. Co. v. Hume, 59 Tex. 47; Carter v. Bush, 79 Tex. 29, 15 S. W. 167. It was the duty of the trustee (the Rosebud Bank) to set up its trust relation, and at least to have notified the appellant, as it did, so that the whole matter might be determined.

The cases relied upon by appellant, to the effect that a third party cannot set up equities as against a garnishee, are not applicable. Such cases refer only to where the party attempting to set up his equities has no connection with the transaction being litigated. For instance, in the instant case, when Sapp sued the refining company and garnisheed the Rosebud Bank, it would not have been permissible for some party not connected with the transaction to have intervened and alleged that Sapp was indebted

to him, and have asked that the garnishee be required to pay over to him whatever amount it might have owed to Sapp. Noyes v. Brown, 75 Tex. 458, 13 S. W. 36. On the other hand, had appellant sued the Rosebud Bank to recover the $2,000 on deposit as evidenced by the certificate, Sapp would have had the right to intervene, on the ground that he was entitled to the specific money sought to be recovered by the plaintiff therein.

Appellant assigns error as to so much of the judgment of the court as required it to pay all costs in the suit, including attorney's fee for the garnishee of $25. We do not think that any costs, except that incurred by reason of the contest filed by appellant, should be chargeable against it. A portion of the cost in this case was incurred before the appellant was made a party hereto, and would have been required to have been paid if the appellant had not filed any contest as against Sapp's claim against the garnishee. The appellant has not set out, in its brief, the particular items of costs wrongfully adjudged against it, except as to an attorney's fee of $25. However, we have examined the bill of costs, and find that the following items therein should not have been charged against appellant, namely:

### District Clerk's Fees.

| | | |
|---|---|---|
| Filing and docketing | $ | 35 |
| Appearances | | 30 |
| Filing and approving bond for garnishment | 1 | 65 |
| Writ of garnishment and copy | 1 | 50 |
| Entering judgment | 1 | 00 |
| Citation and copy | 1 | 25 |
| Copy of petitions | 2 | 40 |
| Taxing costs | | 25 |
| Total | $ 8 | 70 |

### Sheriff's Fees.

| | | |
|---|---|---|
| Serving writ and mileage | $ | 80 |
| Jury fee | | 50 |
| Serving citation on appellant | 1 | 00 |
| Total | $ 2 | 30 |
| Stenographer's fee | | 3 00 |
| Attorney's fee | | 25 00 |
| Total | | $39 00 |

If there are any other items not properly chargeable to appellant, it has failed to point out the same, as was its duty to do. As to the items of cost above referred to, the judgment herein will be reformed so as to charge the same against appellees; otherwise the judgment of the trial court is affirmed. This reformation of the judgment requires the appellees to pay the cost of this appeal, and it is so ordered.

Judgment reformed, and as reformed affirmed.

Reformed and affirmed.

KEY, C. J. (dissenting). After long and careful consideration of this case, the writer is so thoroughly convinced of the fact that it was decided wrong by the trial court that he feels impelled to dissent from the judgment of this court affirming that judgment; and the reasons for that dissent will now be stated.

Perhaps the first question in due order for decision is a construction of the certificate of deposit upon which the Houston National Exchange Bank bases its right to recover against the Planters' National Bank of Rosebud. That instrument contains all the language necessary to constitute a promissory note, payable to the Columbian Refining Company or its order three months after date, unless it be that the last sentence therein, stating that it is not subject to check and is not negotiable, destroys its effect as a promissory note. I am of the opinion that the statement that the certificate was not negotiable was not intended to limit the power of the Columbian Refining Company to assign it and vest in the purchaser all the title which was held by the refining company, and that the inhibition against drawing checks for the money was intended to be limited to the period of time intervening before the instrument fell due. Any other construction would place it in conflict with the specific statement in the preceding part of the instrument, whereby its maker, the Planters' National Bank, promised to pay the money therein specified to the Columbian Refining Company, or its order. A written unconditional promise to pay at a specified time to a person named or his order a designated sum of money is a promissory note, and such is the instrument under consideration. See sections 1 and 184 of the Uniform Negotiable Instruments Act, approved March 24, 1919 (Vernon's Ann. Civ. St. Supp. 1922, Arts 6001—1 to 6001—184).

The word "negotiable" has more than one meaning, and in its commercial sense, when used in reference to bills of exchange, promissory notes, and similar instruments, it signifies that such instruments carry with them, by indorsement, the legal title; but also that when acquired before maturity, for a valuable consideration, and without notice of any equities between the maker and the assignor, the assignee is entitled to collect the full amount specified in the instrument. We all agree that the language "not negotiable" contained in the instrument under consideration was merely intended to deny to any holder the right to claim such protection as an innocent purchaser, and was not intended to limit the power of the Columbian Refining Company to transfer its title to the instrument, subject to whatever equities might exist between the maker of the instrument and the refining company. This construction allows full effect to be given to all of the terms of the instrument, and brings the case within the purview of article 583 and article 584, copied in the majority opinion. Those two statutory provisions were construed and ap-

plied by our Supreme Court in the case of Stamford Compress Co. v. Farmers' & Merchants' Nat. Bnk., 105 Tex. 44, 143 S. W. 1142, Ann. Cas. 1914D, 1298. In that case the Compress Company issued an instrument, which read as follows:

."No. 290. Stamford, Texas., May 13, 1908. No. Bales 42. Stamford Compress Company. Received from West Cotton Yard for account of Will Rives, mark ——, at owner's risk forty-two bales cotton. Not responsible ·for water damage or loss or damage by fire. This receipt must be returned on delivery of the cotton and is nonnegotiable.  [Signed] T. O. Purkett, Supt."

For a valuable consideration, Will Rives delivered the receipt to the Farmers' & Merchants' National Bank, and thereafter the compress company delivered the cotton referred to to Will Rives, he stating to the compress company that the receipt was among his papers and that he would deliver it to the compress company. It seems that the receipt was transferred by Rives to the bank, but the compress company had no notice or that fact at the time it delivered the cotton to Rives. Applying the two articles of the statute, set out in the majority opinion, the Supreme Court said:

"By the plain language of the two articles copied, the rights of the parties are 'defined to be that the bank acquired title to the property, and by notice to the compress company could have compelled delivery to it, the bank, and if the compress company had, after such notice, delivered the cotton to Rives, it would be required to pay its value to the bank. The right given by article 309 to sue on the contract is predicated upon the provision that requires it to allow all defenses which the compress company had against Rives which arose in favor of the compress company before it had notice of the assignment of the receipt."

In the case at bar, the undisputed proof shows that the Houston National Exchange Bank gave notice to the Planters' National Bank that it had become the owner of the certificate of deposit prior to the time the plaintiff Sapp acquired any right against the Columbian Refining Company. When the Houston National Exchange Bank bought from the Columbian Refining Company the certificate of deposit, it acquired at least all the title the latter then had to that instrument, and when it demanded payment thereof after it fell due, the Planters' National Bank owed it the amount specified in that instrument, unless it be true, as held by the trial court, that appellee Sapp had acquired a superior right to the money which the Columbian Refining Company had deposited with the Rosebud Bank. After acquiring notice of the rights of appellant, neither the Planters' National Bank nor the Columbian Refining Company could make any contract that would affect the rights of the Houston National Exchange Bank, unless it be, as

held by the trial court, that the $2,000 on deposit with the Rosebud Bank was held by the latter as a trustee for the benefit of any person who might erect the filling station for the Columbian Refining Company.

The other members of this court, as shown by the majority opinion, hold that the finding of the trial court last referred to is supported by the testimony, and that although the certificate of deposit was in law a promissory note, payable to the order of the Columbian Refining Company, and not disclosing any trust or the rights of any other persons, nevertheless, as it stated on its face that it was not negotiable, appellant; the Houston National Exchange Bank, was charged with notice that a trust existed in favor of appellee Sapp. Upon that ruling, the writer dissents, because the proof fails entirely to show that there was any valid contract or agreement, either express or implied, before appellant acquired its rights, by which the Rosebud Bank became a trustee for the benefit of any one who might thereafter, in whole or in part, construct the improvements referred to.

The majority opinion does not set out the testimony which it is held supports the finding of the trial court that the money deposited by the refining company with the Rosebud Bank was intended as a trust fund with which to pay the claims of all persons who might contribute in the construction of the filling station; and therefore, in order that the reasons for my dissent may be understood, the pleadings of the plaintiff Sapp, as well as all the testimony relating to the question of trust, will here and now be set forth.

The plaintiff Sapp alleged in his pleadings:

"That the fund in the hands of the garnishee is in substance and effect a trust fund, and was such continuously from the time of its deposit, and was in said bank by the original defendant Columbian Refining Company for a special purpose then and there agreed upon by and between the Columbian Refining Company and the garnishee bank, for all of this, to wit:

"That the Columbian Refining Company was desirous of and was contemplating the erection and operation in the city of Rosebud of a gasoline filling station for automobiles, and accordingly it prevailed upon various and sundry of the citizens of Rosebud to take stock and subscribe and pay money to it for such purpose, and did agree with such citizens as contributed their money thereto and with garnishee bank at the time of making the deposit in question that such deposit was so made for the purpose of carrying out such enterprise and for the purpose of performing its promise to those who had contributed to such fund, and the garnishee bank accordingly accepted such deposit upon the representation of the Columbian Refining Company that said money so deposited for the purpose of erecting such filling station would be used for such purpose; and the garnishee bank accordingly issued, not its usual certificate of deposit, but a certificate of time deposit, which by its terms was declared to be

nonnegotiable; and that therefore the defendant Houston National Exchange Bank, if it purchased such certificate (which is not admitted), did so charged with full notice and knowledge of the use to which said money had been devoted.

"That thereafter and pursuant to the above-mentioned plan, the defendant Columbian Refining Company made and entered into a contract with plaintiff to erect such filling station for the price and consideration stated in plaintiff's suit against the Columbian Refining Company as fully set out in exhibit attached to plaintiff's petition in cause No. 1007, which said contract was carried out and fully performed on the part of plaintiff, and the said Columbian Refining Company has wholly failed and refused to pay plaintiff therefor; and that at the time plaintiff entered into his contract as aforesaid with the Columbian Refining Company, it represented to plaintiff that it had the money to pay therefor in the garnishee bank, and that said money would be used for such purpose; and that the fund in controversy was the only fund claimed by the Columbian Refining Company in said garnishee bank, and was the fund in contemplation of the parties at the time the above representations were made; and that these representations were made for the purpose of inducing plaintiff to enter into said contract and to give bond for the faithful performance of such contract (such bond being a part of the same transaction in which the contract was executed); and that plaintiff relied upon such representations, and would not have contracted as aforesaid but for them.

"Plaintiff further pleads that at the time he entered into said contract and performed same he had no notice or knowledge of the claim of the impleaded defendant Houston National Exchange Bank to said fund, nor of its alleged transactions in connection therewith; and that likewise he had no notice or knowledge of said claim or transaction at the time his writ of garnishment herein was served herein.

"Wherefore plaintiff says that he acquired a superior right in and to said fund, as against the Columbian Refining Company, and as against the Houston National Exchange Bank, by reason of said representations, and by reason of the facts and circumstances connected with such deposit; and that likewise he acquired a superior right in and to said fund by reason of his garnishment herein, and the facts and circumstances connected with such deposit. Plaintiff also denies the allegations contained in the answer of Houston National Exchange Bank."

The Rosebud Bank, the garnishee, stated in its answer that, at the time the writ of garnishment was served upon it, there had been deposited to the credit of the Columbian Refining Company the sum of $2,000, and the same was still on deposit in the garnishee bank; that the instrument representing said deposit and said transaction was the garnishee's certificate of deposit, No. 511, dated July 8, 1920, and reciting that said amount was due and payable three months after date, and the said instrument was nonnegotiable; that the garnishee still had that sum of money on deposit under and by virtue of

252 S.W.—20.

said certificate, and was indebted to the Columbian Refining Company, or to whoever might be entitled to said sum of $2,000, without interest. It also alleged that the Houston National Exchange Bank was claiming to hold said certificate of deposit and to be entitled to collect the same from the garnishee; that it, the garnishee, was ready to pay said sum to whoever was entitled to it, and asked that the Houston National Exchange Bank be made party to that proceeding, in order that a judgment might be rendered that would protect the garnishee. Appellant, the Houston National Exchange Bank, filed an answer, alleging that it had purchased the original deposit certificate for $4,100 issued by the garnishee; that the latter had paid thereon $2,100, and had issued certificate No. 511, showing its indebtedness for the balance of the original deposit of $4,100; that it purchased the original certificate before maturity and paid a valuable consideration therefor without any notice of the adverse claim asserted by the plaintiff Sapp.

In the spring of 1920, a man by the name of Huff, who was an agent of the Columbian Refining Company, went to the town of Rosebud and sought to enlist financial aid and assistance from the citizens of that town, for the purpose of establishing what is commonly known as a filling station. It seems that he was proposing to and did sell stock in the Columbian Refining Company, and in order to do so he made certain representations to certain citizens, who were placed upon the stand as witnesses by the plaintiff, and testified as follows:

J. A. Tarver:

"I am active vice president of the Planters' National Bank. My initials are J. A. I remember the transaction of the Columbian Refining Company on the occasion of them selling stock in Rosebud. A man by the name of Huff was representative of the company at the time; that was in the spring of 1920. As to the agreement that was made with reference to money collected from the sales of stock there in Rosebud, I will state that the agreement had with me was that they were to leave the money in our bank and to build a filling station there. There was something over $4,000 deposited there. As to the representation of the agent with reference to the probable cost of the filling station, I will state I don't remember him ever saying; he showed us cuts of filling stations at Bryan, Navasota, and Houston, and other places; I don't remember what he said the filling station would cost, but the money was to be left there until the filling station was completed, and I purchased stock with the understanding that the money would be left in the bank.

"I know about the original certificate. He approached Mr. Donaldson about paying some interest on it, and about three or four months before it was completed Mr. Donaldson came back and asked me, and said that they wanted a little interest on it, and I said, 'All right; pay them 3 per cent. and issue a certificate, non-

negotiable,' which we always do. I was not there when the renewal of the certificate came up. If I had been, I would not have paid them anything until the filling station was built.

"I took stock in the Columbian Refining Company as an individual."

### O. C. Hughes:

"My name is O. C. Hughes. I live at Rosebud. I lived in Rosebud in the spring of 1920, at the time the representative of the Columbian Refining Company was selling stock there. I was with the agent, Mr. Huff, the biggest portion of the time when he was offering that stock —nearly all the time. The representation that he made to prospective purchasers of that stock was that the money was to be used to put in a filling station there; they were to put in $6,-000, and we the like amount; they had theirs, and we got busy and raised $6,000. He told us to put in as much as we could—so much money and they would take hold of it and put in the balance of it. He said not a nickle would leave town but would be deposited in the Planters' National Bank, and that we would see it spent right there on the corner, and not one cent of it would leave town; he told us all of that. Mr. Huff sold the stock and collected a few Liberty Bonds and some money. I don't think he deposited all of that money in the Planters' National Bank. I think he put $4,-100 in there is the best of my recollection. I thought at the time he put it all in there, but found out later he didn't.

"As to the statement he made as to the probable cost of the filling station, or how much money would be put into it, I will state that he explained to us he was going to put in one worth $12,000 or $13,000. They were going to put in as much or more than the town. He wanted the town to raise $6,000. He told us it was either going to be brick or stucco, and it would have a driveway, and rest room, and four or five carpets on the floor and was going to have an up-to-date and jam-up place."

### E. A. Donaldson:

"My name is E. A. Donaldson. I am cashier of the Planters' National Bank of Rosebud. I occupied the same position in the spring of 1920. I met Mr. Huff, the man that represented the Columbian Refining Company several times. I had a conversation with him with reference to the Columbian Refining Company depositing money that was collected from the sale of stock of the Columbian Refining Company with the Planters' National Bank of Rosebud. He approached me on the matter and said he would like to leave the money there as an evidence of good faith with the stockholders in the town, and it would not be drawn out only for the purpose of erecting a station, and he said he would like to get some interest, and I told him we would allow him 3 per cent., and he told me that the work would be through in 30 days, but that would not give him much time, and he told me to make it 90 days, and we agreed to it. I don't think I was present at any conversation with the stockholders where he told them what the money would be used for, except he got up before the Commercial Club and made a bunch of utterances that the money would not leave the town and asked the co-operation of the officers of the Commercial Club. They want-

ed them to produce a good bond, and he (Huff) told them that they were not running a wild cat scheme, or anything of the kind. He showed us cuts, I believe he said of Galveston, and I believe he said, that cost $20,000, and he mentioned $12,000 as a probable cost of the filling station at Rosebud. He said that the station would be made up of reinforced concrete stucco, with two center driveways, with rest rooms, and it would be well lighted and would contain all equipment and would correspond with any station in Houston or Galveston and would contain every means of luxury that was possible to contain.

"Q. Just before these original certificates were issued to the Columbian Refining Company came due, I'll ask you if you had any correspondence with the Columbian Refining Company and with the Houston National Exchange Bank? A. I had none with the bank. I wrote the Columbian Refining Company I would be glad to renew the certificates if they wanted me to as I had it in my hands at the time, and I suggested that I would be glad to carry it and give them more time to comply with their contract and agreement. There was a $4,100 certificate originally and possibly a $900 certificate —a small one. There was $900 in Liberty Bonds. I don't remember the exact amount, but he said he did not care to cash them at the prevailing prices, and he sent them in to the company to let them dispose of. The letter of June 25th is the first letter I wrote them. About that time I received a telephone message, I think from Mr. DeZavala, immediately after he got notice that this certificate had been returned unpaid, and in that conversation he insisted upon payment of the certificate, and I called his attention to the nonnegotiable clause of that instrument, and he asked me if it had been investigated since its issue, and I informed him that it was a part of the original renewal. The $4,100 was presented to us through the Federal Reserve Bank first, and we returned it under the instructions given us. After that they (Houston National Exchange Bank) directed the First National Bank to present it for collection with instructions to protest if not paid. When I returned this certificate when it was originally presented, I don't think I made any notation on it; I attached our reasons to the certificate.

"Q. I see here a telegram of June 26th to the Federal Reserve Bank (hands telegram to witness). A. That was the original presentation of the certificate; it was originally presented to me on June 26th, and I wired the Federal Reserve Bank. The attached notation was put on this certificate when we returned it; I did not care to write anything on the certificate but attached a notation to it:

" 'This certificate was issued with the express understanding that the money would be used, before the expiration of the certificate, to construct a filling station at this place.

" 'We will pay the certificate when they have complied with these provisions.

" 'Planters' National Bank, Rosebud, Tex.'

"I think the collection was presented on Saturday, and I think on Monday Mr. DeZavala had a wire from the Federal Reserve Bank stating it had been turned down. He (DeZavala) asked why the certificate had not reached him. The certificate did not reach there for

possibly one day after he got the telegram, but it was mailed on the same date we received it. It was in the phone conversation with Mr. De-Zavala that I told him why the payment was turned down. I remembered telling him distinctly that it was placed here with the expressed understanding that the Columbian Refining Company, the indorser, would leave it in the bank and that it was a nonnegotiable instrument and we were returning it. As near as I can remember, I explained that after they (Columbian Refining Company) put the money in the bank they had an understanding with me that it should remain with me until the building was completed; we had quite a lengthy conversation which I do not remember the details of. I don't remember subsequent conversation with Mr. DeZavala. I had a telegram from him —the telegram of June 29th in answer to my letter of the 25th. Mr. DeZavala called us 'collect,' and I told him I was not dealing with the Houston Exchange National Bank and did not care to incur the extra expense and annoyance.

"As to the transaction with reference to the $2,000 in controversy, I will state that after we received a letter from the Columbian Refining Company their agent called on me and presented a letter of introduction and told me he was there to build a station and let a contract for it, and also took up the matter presently in regard to various supplies, and he showed me expense bills and waybills and invoice covering a large filling tank and pump and various things of that kind to go into the station; he showed me a bill of lading consigned to them and to Rosebud. I had different requests from the Houston National Exchange Bank laying claim to this certificate and telling me I should deal directly with 'them, and after the Columbian Refining Company had shown me evidence of starting to work I agreed to release $2,100 of this and reserve the $2,000 to be held back until the filling station was completed, and he (Huff) assured me that was entirely satisfactory. As a matter of fact, I could not issue the $2,000 certificate until the original certificate was sent to us for $4,100, and I think the Houston National Exchange Bank sent it to us, and we issued it ($2,000 certificate). payable to the Columbian Refining Company, and there was a correction in the lettering, and it was changed to the name of the Columbian Petroleum Company or something like that, but it was still made payable to the order of the Columbian Refining Company, the same as the others. That was the certificate introduced here for $2,000. I don't recall that I had any conversation with Mr. DeZavala over the phone with reference to that.

"I remember the occasion of Mr. Sapp making a contract with the Columbian Refining Company for the erection of a filling station. From those letters introduced, Mr. White was over there as representative of the Columbian Refining Company. I was present on one occasion in the bank when Mr. White and Mr. Henslee and Mr. Sapp and Mr. Gaither had a conversation about this contract. I remember Mr. White making a statement at that time with reference to this $2,000. The Columbian Refining Company was requiring a bond from the contractor, and the question was raised as to the Columbian Refining Company's giving a bond as to their good faith and intention, and Mr. White made the assertion that it was not necessary, as they had ample money in the bank to protect the contractor. The written contract that has been introduced in evidence was drawn before then, and they were discussing it then; I can't say I saw the contract signed that was written up between Mr. Sapp and the Columbian Refining Company, but I saw a copy of the contract on the table, and I presumed it to be signed. The Columbian Refining Company did not have any other funds in the Planters' National Bank except the $2,000.

"On the 3d of July, the date of the contract, they did not have any other money in the bank other than covered by the certificate of deposit to the Columbian Refining Company—none other than shown by the certificate of deposit.

"Mr. White was the agent that came up there representing the Columbian Refining Company that was mentioned in the letter referred to here this morning. He was the man who was to let the contract and complete the work. He had a letter of introduction and credentials showing that he was the authorized representative.

"Q. I'll ask you to state whether or not at that time or any other time you told Mr. Sapp or Mr. Gaither that the Houston National Exchange Bank was making any claim on this fund? A. I don't remember having mentioned that until after this suit, that there was any claim being set up at all.

"The second certificate of deposit, I presume, was issued by the Planters' National Bank on the 8th of July. I did not have any negotiations with this same Mr. White with reference to issuing this second certificate. I had negotiations with the home office at Houston of the Columbian Refining Company. Our first interchange of letters had taken place somewhere around June 25th with reference to these certificates of deposits; that is, the original one of $4,100.

"Q. So that, from about that date on, you knew that the Houston National Exchange Bank was claiming to own that certificate of deposit? A. The only information I had that the Houston National Exchange Bank had interest in this was when I received the letter introduced this morning from the Houston National Exchange Bank—about the same time that Mr. DeZavala and myself had the conversation over the telephone. I wrote a letter up there and they (Houston National Exchange Bank) accepted the proposition. They accepted the $2,000 certificate, and the $2,100 in cash was paid, and the $2,000 certificate was given as a basis for a compromise and afterwards the certificate was sent to us; at the same time Mr. White came up and represented to me that they were going ahead and build the station and fulfill the contract and showed me evidence that they were shipping the stuff there. We first reached the agreement as to the payment of cash, and by way of compromise I gave them a new certificate, but I would not issue the second certificate until the first had been returned to me. It is perhaps correct that we reached an agreement with reference to that matter some days before the 8th of July.

"The contract between Mr. Sapp and the Columbian Refining Company was made about the 8th of July, but I do not remember with reference to that date when it was that Mr. White and

.Mr. Sapp had the conversation I testified to. I only remember him trying to make the contract. They possibly had agreed on the contract and came in there trying to make the bond. They had some kind of written paper when they came in, and to the best of my recollection it was not signed up at that time.

"Q. At that very time you knew that the Houston National Exchange Bank was claiming to own that fund there by assignment and indorsement by the Columbian Refining Company? A. I knew from that letter they were claiming the fund. I did not know that the Houston National Exchange Bank had anything to do with them (Columbian Refining Company). I never did ask them if they had any interest in it. I had nothing to do with this garnishment about the claim of the Houston National Exchange Bank.

"Q. At that time you knew that the Columbian Refining Company did not hold that certificate of deposit; you had notice to that effect from the Houston National Exchange Bank, did you not? A. Possibly so, and possibly from the Columbian Refining Company; I think they (Houston National Exchange Bank) notified me that they had it and was claiming it and had it in their possession.

"Q. On July 3d, then, since your second certificate of deposit was not issued until July 8th, the Columbian Refining Company or the Houston National Exchange Bank, or whichever one holds that certificate had not had the $2,000, but the $4,100 deposit was at your bank? A. Yes, sir. All of my transactions with reference to this compromise and extension was had with the Houston office of the Columbian Refining Company, and no representative of that company came up to Rosebud to deal with me about the matter. I really don't know whether Mr. White was there at the time the second certificate of deposit was issued or not.

"As to whether we got the $4,100 certificate when we arranged to settle, I will state that it was sent to us by the Houston National Exchange Bank. As to how we sent the new certificate, I will state I think we attached our draft for $2,100 and certificate of deposit payable to the order of the Columbian Refining Company. That's my recollection of the matter; I think the draft was made payable to the bank; we had to make it payable to them because it was sent to the bank.

"That was the ordinary course of business. It was made in form, and we were responsible to them for them—in making remittances and so on. The usual certificate of deposit that we issue would be issued usually with a deposit ticket; this time certificate of deposit is handled altogether on separate books but does not go on the deposit book at all."

Roy Gaither:

"My name is Roy Gaither. I live at Rosebud. I am manager of the Wm. Cameron Lumber Yard & Building Material. I know Mr. Sapp, the plaintiff. I worked with him in the making of this contract and associated with him in looking after the contract. The first information that I had of the contract to be let, or that the Columbian Refining Company wanted to build a station there, was when they wanted to .sell me some stock. Mr. Huff and Mr. Ollie

Hughes came and tried to persuade me to purchase stock, and I told them I did not care to invest in it, and they talked on awhile, and I didn't invest the first time, and they assured me then, regardless of whether I did invest or not, if they had anything to do with the purchase of the material that I would sell them the material, and later they both told me they lacked one or two and they wanted to close up that day, and I took stock that day, and that was the first knowledge I had that they wanted to build the station. At that time Mr. Huff stated to me that the money would be placed in the Planters' National Bank and would be expended in the building of the station, and he further stated that additional money to that subscribed locally would be put into the erection of the filling station. Along about the 1st of July, I had information that they contemplated letting a contract for the erection of this station. Mr. C. M. White came there as construction engineer, and he came up with a blueprint and submitted it to us and wanted a contract on it, and I told him we did not contract, but that we would get him a contractor, and we got Mr. Sapp under their contract, and he (White) showed us a blueprint of a station prepared for Louise, Tex., of frame stucco, and I immediately called his attention to the fact that the location was in the fire limits, and it would be necessary to make some changes on it, and it was agreed that we would change the contract which we did, and it would be a metal-lath stucco construction with cement floor and a certain kind of roofing that could pass the ordinances, and he asked me to make out a bill of the material to go into the contract covering an ordinary stucco, so I made out a bill of the material, and Mr. Sapp went over it with me, and we had it too high. It ran higher than they wanted to expend; I don't think he told us at that time it was high, but we finally got to an agreement as to the bill for material, and we got down to the contract where it was not to cost over $2,000, and we figured about $50 over that and that cut us off. After it was agreed on the sum or amount of money Mr. Sapp would take the contract for, we went over to the Planters' National Bank, and a contract was drawn by Mr. White unsigned, and a bond, and he handed them to me to read, and I read them and passed them on to Mr. Sapp, and in reading the bond I told him it wasn't strictly a bond; the bond was so constructed that Mr. Sapp was expected to build, erect, and finish in a good, substantial, and workmanlike manner in conformity with the plans and specifications, but there wasn't anything said about their living up to their obligations of paying Mr. Sapp according to the contract, and he spoke of having money there to amply protect the bondsmen. Mr. Sam Henslee wanted to know if he (Sapp) would be protected; that Mr. White was without bond, and he (Sapp) had no assurance that the money was in the bank, and at that time they came up and were looking over the con-. tract and bond that was to be signed up, and Mr. Henslee was asked to sign as surety to Mr. Sapp. He (Huff) stated that they were leaving $2,000 in the bank, the Planters' National Bank, to protect us. That same day I asked Mr. Donaldson about it, and he told me he was letting them have some money from the money under representation that they had

ordered a tank and that they had showed him a bill of lading for that and some pumps also. That $2,000 was to be left there. Mr. Donaldson assured us that this $2,000 was being left there, and Mr. White told us also. Mr. White told us about this tank being on the road and would be unloaded and it would be there to show for it, and Mr. Donaldson told us he let them have that money for these things, that were coming and $2,000 was being held. At that time I absolutely knew of no claim that the Houston National·Exchange Bank was making on this fund. The first information I had was when they read the answer of the Planters' National Bank in the writ of garnishment.

"This original contract of construction with Mr. Sapp was entered into with the Columbian Refining Company the first part of July, and he went to work on it in July, and he went on and finished 21 days of it, and during the 21 days he completed 80 per cent. of his contract, and when he had finished the first part of the work in August, Mr. Sapp drew on the Columbian Refining Company for part of the work, and we waited a few days then for Mr. White to come down, and there was some correspondence had with them, and they told us their engineer would be there and told us the reason the first draft had not been paid; that it was because the work had not been O. K.'d by the engineer. When he (engineer) came down and inspected the work, he O. K.'d the draft for the amount of $1,200 which was drawn payable to the Planters' National Bank with Mr. Sapp on it. ·That draft stayed down there (Houston) quite a bit. and it was returned to the Planters' National Bank unpaid, and we wrote them and asked them why they did not pay it, and they wrote and told us to return it and they would pay it. I remember discussing it with Mr. Donaldson, and I told him we would have to go ahead and complete the other 20 per cent., then garnishee the money Mr. White told us he had in there; that they had not come clean with the contract and had not completed their contract. We discussed the money matter and decided we had no right to draw it out ourselves. We drew on the Columbian Refining Company at Houston, and we figured on completing the work, and then if they did not pay us we would garnishee the bank. We understood it was in there with a nonnegotiable note. I understood it was nonnegotiable the day White was there, and the question was asked Mr. Donaldson as to the representation— or whether the money was left there or not. On July 3d Mr. White told us the money was in the bank on deposit. He never said anything about the claim of the Houston National Exchange Bank.

"He did not say that they (Houston Exchange National Bank) had in their possession the $4,-100 deposit; he did not mention the Houston National Exchange Bank. He told us he was leaving the money there, $4,100 to protect the bondsmen as well as us. He told us it was represented by a nonnegotiable instrument, and we gave them 90 days from then to complete the job, and on the day the contract was drawn I asked Mr. Donaldson if they left $2,-000 there, and he informed me that they had and that verified Mr. White's statement. He told us the company would not allow him to sign a bond, but he had made Mr. Henslee sign a bond, and he (Henslee) wanted to know what protection he would get if he signed the bond."

The plaintiff, T. M. Sapp, testified as follows:

"I am the same Sapp that entered into a contract with the Columbian Refining Company to put in a filling station at Rosebud under the terms of the contract dated July 3, 1920. I completed that filling station according to the plans and specifications.

"I don't know just the time I completed it. Mr. White asked me when he made the contract to be sure not to put down the cement until the tanks came in for the floor, and I held back on that account for two or three weeks, and he came up and accepted the work as far as it went and told me to go ahead and put the piping under the cement, and that was not in my contract, and he said he would allow me extra for the work, and I went ahead and put the piping in so that the tanks could be connected with it afterwards and he accepted the work that far. I don't recollect what date that was; the papers will show. As to whether or not it is my recollection that Mr. White accepted the work September 18th, I will state that it was before that. I could not finish it until the pipes were put in, and he said to wait until that was done, and I waited about two or three weeks, and that made it about September that I completed the work or the major portion of it.

"I live at Rosebud. I am a contractor. The first time I opened negotiations with the Columbian Refining Company for the erection of a filling station was the 1st of July or the 3rd of July, when I signed the contract, and at that time I was building a shed at the compress in Rosebud. We had had various talks about the contract, and Mr. White came over from Temple and came where I was at work, and told me he wanted to close up the contract for the filling station, and told me that they had everything all right to contract it and put it up, and told me the money and everything was all right. I·did not want to leave my work and fool with it, and he told me everything was all right for me to go ahead, and I went with him uptown, and we fixed the contract, and he wrote it out and a bond with it, and we went over to the Planters' National Bank and signed it up, and the question came up about a bond for protecting the lumber man, and he (White) stated that they had the money there in the Planters' National Bank, and we were in the Planters' National Bank at that time, and he required me to give bond, and I gave bond on it and went ahead and signed up everything, and he went on back to Temple, and I went ahead and put in the station, and he told me, he asked me that day not to put the cement floor down until after the plumbing was done for the filling tank, and he was gone a good while, and I was stopped waiting for him to come back to bring the plumbing stuff, as it was not in my contract at all. He came back and told me to go ahead and place the piping and showed me where to put it—air pipe and oil pipe and gas pipe—and I went ahead and finished the contract, and I notified them it was done and that they could send their construction engineer and settle for it, and they wired me that Mr. White's time was occupied and it would be

the last of the week before he would reach me, and he never did come.

"He told me the money was already fixed when he came down where I was working and said it was in the Planters' National Bank. He told me he had the money to pay the contract with. We went over to the Planters' National Bank with the contract and bond, and while we were in there the question came up about the bond, and he said it would be protected by the money in the bank, and he said the purpose for which he placed the money in the bank was to pay the contract.

"My contract reads that they were to pay me 80 per cent. of it after two weeks for the labor done and material; yet he never did come up to see it, and I drawed a draft on them and sent it down, and they wouldn't pay it, and I thought they would pay it out of that. I remembered it was to be paid out of that; I didn't suppose they would send the money up there from Houston when they had the money to pay it out. When Mr. White came down to the compress and told me that the money was in the Planters' National Bank, I relied on that statement and representation, and only because they were an out of town firm and I did not know anything about them, and with the construction engineer's name on the paper I thought it was sure good. I don't suppose I would have signed the contract and gone on with the work had I not been relying on that representation. Him being a stranger, it made me safer when he told me he had the money there. I was down at the compress when he came down there, and I was busy, and I didn't care to fool with it then I did not think. He stayed down there a couple of hours before I went to town with him. I didn't care whether I took it or not. The thing that made me go to town and take up the matter of contract with him was when he told me it was all right and the money was in the bank; that made the difference with me; it looked like it was 'plum' safe to go ahead and make it. I didn't have any knowledge or notice that that Houston National Exchange Bank had any claims on the fund. I didn't know anything about the Houston National Exchange Bank having any claim on it or anybody else until this case came up. The first thing I knew about it was when the Houston National Exchange Bank at Houston claimed the money.

"Q. At the time you got out the writ of garnishment on the Planters' National Bank, I'll ask you whether you had notice of that at that time or prior to that time? A. No, sir.

"Q. That is the case you are talking about, the garnishment of the Planters' National Bank? A. Yes, sir. It was after that, and they never did say why they would not pay the draft, only they would pay it in a few days; they even phoned me that they would pay it in a few days.

"The amount of the contract was $2,000. I carried that contract out according to the specifications and plans, and Mr. White came and looked over it once and marked it O. K. as far as I had gone with it.

"I sent these drafts to the Columbian Refining Company for collection. I had the Planters' National Bank to do it, and the Planters' National Bank went on and forwarded my draft to Houston, and they never said a word to me

about why it wasn't paid, and did not say anything about the claim of the Houston National Exchange Bank. Altogether I forwarded two drafts, and Mr. Donaldson fixed up the drafts for me at the Planters' National Bank and sent them."

A. DeZavala testified for the Houston National Exchange Bank as follows:

"My name is A. DeZavala. I am active vice president of the Houston National Exchange Bank of Houston. I have occupied that position since about April of last year up to the present. I am acquainted with the officers or representatives of the Columbian Refining Company, and during that period of time they were customers of the Houston National Exchange Bank and did some business with us. As to whether or not we had any dealing with the Columbian Refining Company some time the latter part of April or the early part of May with reference to the purchase of a certificate of deposit which was issued by the Planters' National Bank of Rosebud, I will state that we did. It was along in March or the latter part of March or the first of April that they called and requested that we purchase from them a certificate of deposit of $4,100 of the Planters' National Bank of Rosebud, and of course knowing the bank as I did we purchased that certificate. The certificate, if I remember, was a $4,100 certificate, dated the latter part of March, the 27th of March, and ran for three months, or about a three-months certificate, and I think it drew 3 per cent. interest from date, and we purchased that certificate plus that 3 per cent. and a little extra, which made it 8 per cent. for us on the investment. We paid the money to the Columbian Refining Company in cash.

"Q. Look at that certificate and state whether that is the terms identical to the terms and the amount of the certificate. A. I would say that this is an exact copy of it, except the date, number and amount. When this certificate for $4,100 became due three months after the date, approximately June 27th, we put it in the regular course of collection for the payment of same and the interest to the bank at Rosebud, and, as I remember, we got a wire from the bank refusing it. I think my attorney has a copy of that correspondence. The date of that wire was October 2d, and that occurred the last of June or the first part of July—the last of June I am quite sure. On June 30th payment on the time certificate of deposit on the Planters' National Bank was refused and signed by the First National Bank of Rosebud, the bank to whom we forwarded our bill for collection. Naturally we were surprised at a National Bank refusing to pay on a certificate of deposit, and I think we took the matter up with the bank, and we demanded payment as innocent purchasers. I don't know whether he told me the account was garnisheed or not, but still we demanded payment. After we discussed it with our attorneys, it wasn't paid for six, eight, or ten days. The attorneys and advisors for the bank and one of the members of the Columbian Refining Company had an agreement to pay us half of it and issue a new certificate for $2,000 for three months and bearing 3 per cent. We had no disposition to push the matter and we accepted the $2,000 and the new certificate and

liquidated that matter which was past due and in our file. This certificate of $2,000 that has been introduced in evidence was indorsed and delivered to the Houston National Exchange Bank. We purchased the certificate and was part of the $4,100 payment that was issued by the Columbian Refining Company and indorsed properly by them to us, and of course the certificate of deposit was delivered to us. The Houston National Exchange Bank has been the holder of that, and it has been in our files, and we are still the owners. After receiving quite a bit of correspondence, I called the Planters' National Bank, as the note belonged to me, and I think I called them first, concerning the negotiations and payments of this certificate, and by way of extension I talked to the Columbian Refining man and also to the bank, and they told me they would settle it this way, me being the holder of the $4,100 cash, and he told me he would issue a new certificate for $2,000 for three months, and that was accepted by the Houston National Exchange Bank, and it is still the holder of that certificate, and it has not been paid, nor any part of it. Legal demand has been made for its payment.

"The first information I had that these first certificates would not be paid was when I received a telegram dated June 30, 1920, dated Rosebud, Tex., from the First National Bank, stating that the bank refused.

"Q. To refresh your memory, isn't it a fact that you saw a letter dated June 26, 1920, addressed by the Planters' National Bank of Rosebud to the Columbian Refining Company of Houston? A. No, sir; I remember seeing that letter, but it was after forwarding the certificate. This telegram here that is addressed to E. A. Donaldson, at Rosebud, and dated the 29th, 'Abaco neckband your letter requesting renewal this certificate. Unless remittance or your wire covering to effect you will honor this certificate here tomorrow morning, other action will be taken,' was the first. Evidently I saw the letter addressed to the Columbian Refining Company, and immediately when I saw it I wired the bank. I will say the first date was June 29th, and that's when I wired the bank. I haven't the original of that letter; I never saw this letter before and never heard of it. I addressed the telegram that is dated June 29th to the Planters' National Bank. 'Abaco neckband' is a code used by the banking association and refers to our collections if I remember clearly—I haven't the book before me—that I just read was June 26th my telegram referring to the letter of October 25th, which letter you haven't shown me yet. June is the sixth month, and the letter I just read was dated Rosebud, June 26th. My telegram is in answer to the letter I saw in answer to your letter of June 25th to Columbian Oil & Refining Company asking for renewal of the certificate.

"Counsel to the Witness: Here it is—June 25th? A. This is still not the letter, the original letter addressed to the Columbian Refining Company you have not shown me yet, the one I sent this wire to.

"Counsel to Witness: This is the 25th letter you are talking about? A. That is a copy of the letter of the 25th; that's the letter I answered with a wire. After reading this letter of the 25th, I sent them a wire on the 29th. I received a wire from the Planters' National Bank on the 29th stating that they refused payment at that time of the certificate issued to the Columbian Refining Company for reasons stated. We had a conversation that same day by wire, but no reason was stated at that time; we did not know; the wire did not cover. We possibly had a conversation over the phone that same day. About the 30th we received a letter from the Planters' National Bank dated June 29th.

"Counsel to Witness: Read that letter. (Witness reads letter of June 29th before jury, which is as follows: 'Rosebud, Tex., June 29, 1920. Attention, Mr. DeZavala. Houston National Exchange Bank, Houston, Texas—Sirs: This letter confirms our telegram to you to-day as follows: "We refuse payment at this time of certificate issued to Columbian Refining Company for reasons stated." We are refusing to pay this certificate to you because of the last clause in the certificate, which reads: "this certificate is not subject to check and is not negotiable." The Columbian Refining Company knows why we are refusing the payment of this certificate, and we must ask that you go back on the indorsers for redress. Yours truly, E. A. Donaldson. Cashier.'

"The word 'cashier' is printed and not signed by the officer of the bank. I did notice it as being a letter from the bank, and it referred to the telegram I received the day before from the bank. My first recollection was that it was about the 29th of the month, which is shown by the telegram and letters; that's the first recollection we ever had. On June 29th I wrote a letter to Mr. E. A. Donaldson, cashier of the Planters' National Bank.

"Q. In this letter you said, 'this matter will go into the hands of our attorney and also to both the state and American Bankers' Association within a few days,' and 'payable to the order of the Columbian Refining Company, payable to the order of themselves in current funds and on the return of this certificate properly indorsed.' That being the case, and as the certificate is returned and properly indorsed, it is now up to you to pay same and pay it promptly. Were it not for the fact that I have before me a certain letter written by you, Mr. Donaldson, as cashier, dated June 25th, and addressed to the Columbian Refining Company, voluntarily requesting that they allow you to renew this certificate, and if it is agreeable that you will pay them the same rate of interest and to send it in and you will send them a new certificate together with a check for the accumulated interest, I might be of the opinion that there was some sort of a contract existing between you; but with this fact, and with the further assurance of the fact from the Columbian Refining Company and their officers that there is no such contract or understanding existing, but that they did intend and yet intend to build a station there, but this money was not to be left there until the station was completed, and with these things clearly in my mind, there can be no misunderstanding or doubt that this certificate must be paid on its presentation. I am, therefore, to-day forwarding it to your neighbors, the First National Bank of Rosebud, with instructions to present same, and if not paid to protest and return. If it is a matter with you of temporary funds to take care of this certificate, you should certainly have advised us or

the Columbian Refining Company of that, but under the circumstances there is nothing for me to do, being the innocent purchaser of this certificate, but demand payment of same,' as above stated. Attached to the certificate is a letter from the Columbian Refining Company demanding of you payment of this certificate. Please give this matter your prompt attention and oblige, yours very truly, August DeZavala, Vice President.' You wrote that? A. Yes, sir. When the Columbian Refining Company showed me this letter the day before, as soon as we got the wire we wanted to know what it was, and we expressed a surprise that the bank had turned down the certificate, and we wanted to know what it was. We purchased the certificate as a good purchase. We purchased it from the Columbian Refining Company as we would others. At the time I wrote this letter, I inquired of the Columbian Refining Company to know if that money left by them was in the Planters' National Bank, and I made further inquiry of the bank. I received a letter, I think, from the Planters' National Bank dated June 30th.

"Counsel to Witness: Read that (hands letter to witness). A. 'Sheet Number One. Now Mr. DeZavala, I want to say that the only object we have in refusing to pay this certificate is, that the Columbian Refining Company agreed that this money should not be withdrawn until the station was built at this place, and we made this certificate due 90 days, after their agent had said that the station would be complete within 30 days, but we would suggest that we make later so as to give them plenty of time. Each person who bought this stock was told that the money would not leave the town, but would be put into the buildings as specified. We issued a certificate that was nonnegotiable, and we do not know you or the bank you represent in this transaction, but we are dealing with the Columbian Refining Company. We have again refused payment of this certificate to the First National Bank here to-day for the reasons already stated. I can say to you that this certificate will be paid when this company has complied with their contract, and as their engineer is on the ground I feel that they are going to do something soon. As far as this bank being short of funds, I want to say that we keep money on hand to take care of all maturing obligations, and there has been no time that we could not have paid this certificate, so far as the finances are concerned. I would like to suggest to you that you use your good office to spur the company up and let us end this matter.' I received that letter; I'm sure that is a correct copy. That proposition was received the 1st of July. After that time we accepted from the Columbian Refining Company the certificate already introduced in evidence for $2,000; that matter hung fire for some eight or ten days, and an agreement was made, and they paid us $2,000 cash, and new certificates were made for the balance of it. This certificate was dated about July the 8th. I think it was received directly from the bank, or it might have been the Columbian Refining Company that brought it to me. We know that they gave us a $4,100 certificate, and the bank would not have issued a new certificate without delivering that certificate issued for the Columbian Refining Company and indorsed by the Columbian Refining Company to us. The Planters' National Bank wrote me on June 30th, if that's the original letter, which it appears to be, that they did not know us in the transaction and they were dealing with the Columbian Refining Company. With reference to the telephone conversation, I talked to Mr. Donaldson, possibly on more than one occasion. It is a fact that he told me over the phone that he would pay to the Columbian Refining Company so much cash and renew the certificate to them; he did not make that statement; he knew the certificate was ours. He was to pay us $2,000 and release $2,100 and issue a new certificate to cover our indebtedness, and that was the extent of our phone conversation —which we accepted. I did not say that I talked to the representative of the Columbian Refining Company, who was in Rosebud, that day.

"Q. I understood you to say you talked to Mr. Donaldson and a member of the Columbian Refining Company the same day? A. Yes, sir. At the time we received the $2,000 certificate from the Columbian Refining Company, we did not know that the Planters' National Bank was refusing to pay out this money on the ground that it was left there with instructions that it be paid out for the erection of the filling station. I could not give the exact date of how long the bank held that original certificate; a few days after its date; after March 27th, 1920; a very few days afterwards after the date of the original certificate of $4,100."

Several letters and telegrams passed to and from Mr. Donaldson, acting for the Rosebud Bank, and the refining company and appellant, Houston National Exchange Bank, but it was not claimed in any of them that the Rosebud Bank held the money in question as a trustee for the plaintiff Sapp, or for any one else other than the persons who had purchased stock in the refining company. On June 25, 1920, Mr. Donaldson, as cashier, wrote to the refining company, stating that the certificates of deposit issued by his bank to the refining company would soon be due, and offering to renew the certificates and hold the money for the refining company for a longer period of time, at the same rate of interest. It was also stated that the Rosebud Bank was having many inquiries as to when work would begin on the filling station, and that those who had invested money with the refining company were getting very restless and asking that company to advise the Rosebud Bank upon that subject, in order that it might try to keep the Rosebud investors satisfied; and it contained this sentence:

"Your letter addressed to the stockholders' as to buying some of the bonds that you are issuing are falling on barren ground, as they feel' that you should begin work before asking them to subscribe further."

On the following day Mr. Donaldson wrote to the refining company as follows:

"We have returned the certificate of deposit for $4,100.00, given you by this bank, unpaid. We must decline to pay this, or the other one-

for $900.00 that will mature in a few days, until you comply with the understanding that we had with Mr. Huff, viz.: That this money was to be used in the construction of the filling station at Rosebud, and was left here in good faith of your intentions to construct this filling station according to the plans that you submitted when that stock was sold.

"You have promised to begin work at different times but nothing has been done. All we ask is that you get busy and build this station, after which we will pay these certificates, but until you do so we must decline payment.

"Your representative told the people that had subscribed this money that it was on deposit in this bank and would not leave town until the station was constructed, and he had this understanding with us, and it is for these reasons that we refuse to pay."

On June 30th, Mr. Donaldson, as cashier, wrote to Mr. De Zavala, the vice president of the Houston Bank, and said:

"I want to say that the only object we have in refusing to pay this certificate is, that the Columbian Refining Company agreed that this money should not be withdrawn until the station was built at this place, and we made this certificate due in 90 days, after their agent had said the station would be complete in 30 days, but he would suggest that we make later so as to give them plenty of time. Each person who bought this stock was told that the money would not leave the town, but would be put into the buildings as specified. We issued a certificate that was nonnegotiable, and we do not know you or the bank you represent in this transaction, but we are dealing with the Columbian Refining Company. We have again refused payment of this certificate to the First National Bank here, to-day, for the reasons already stated. I can say to you that this certificate will be paid when this company has complied with their contract, and as their engineer is on the ground, I feel that they are going to do something soon."

If the proof shows that there was any trust, it was only for the benefit of those citizens of Rosebud who subscribed and paid for stock in the Columbian Refining Company; and there was an entire failure to prove that Mr. Sapp had either subscribed or paid for any such stock, and there is no claim in either pleading or testimony that Mr. Sapp had acquired any interest under any of the Rosebud subscribers for stock. Furthermore, the undisputed proof shows that if the Rosebud Bank held the money referred to in trust, for the benefit of certain subscribers to the stock of the Columbian Refining Company, the trust ceased to exist before the case was tried. If any such trust existed, it was for the purpose of securing the construction of the filling station in Rosebud, and the undisputed proof, as well as the allegations in appellee Sapp's pleading, show that the improvement referred to had been completed before the case was tried. Therefore it would seem that if the persons in whose favor that trust existed had sued the Rosebud Bank to enforce the trust, or for damage for its breach, it would be sufficient answer for the Rosebud Bank to show that it had held the money until the filling station was erected, and the trust thereby terminated. The Rosebud Bank, the garnishee, filed no reply to the plaintiff Sapp's averment in his pleading that the filling station had been completed, and offered no testimony to controvert his evidence to that effect; nor did it ask to have the citizens of Rosebud who had purchased stock from the Columbian Refining Company made parties to this proceeding. Hence I conclude that the garnishee does not now claim to hold the money in question for the benefit of the subscribers referred to.

Mr. E. A. Donaldson was the cashier of the appellee Rosebud Bank, and represented it in the transaction under consideration; and while he and some other witnesses stated that Mr. Huff, who represented the Columbian Refining Company, said that all the money paid by the citizens of Rosebud for stock in the Columbian Refining Company would be kept in Rosebud and used for the construction of the filling station referred to, he said more than once that the agreement between the Columbian Refining Company and the Rosebud purchasers of its stock was that the money referred to should not be withdrawn from the bank until the station was completed.

No witness testified that part of the consideration which induced certain citizens of Rosebud to purchase stock in the Columbian Refining Company was a promise on the part of the refining company that the money paid for such stock should be used to pay for the construction of the filling station; and the mere fact that it may have stated to such purchasers that the money referred to would be used for that purpose did not constitute a binding contract to so use it. Even if such promise was made, it was not shown that there was any consideration therefor. It was not shown that the stock which the Rosebud citizens purchased in the refining company was not worth all they paid for it; nor was it shown that the refining company promised to use that money to pay any debt which the Rosebud subscribers owed or might become liable for. Therefore it does not appear that any harm has resulted to the subscribers for stock by the failure of the refining company to pay Mr. Sapp for the construction of the filling station. But, as said before, the undisputed testimony coming from Mr. Donaldson, the agent and manager of the garnishee, the Rosebud Bank, shows that the money was deposited in that bank upon the express agreement that it was not to be withdrawn until the filling station was completed, and the plaintiff Sapp alleged in his pleadings and proved by his own testimony that the filling station had been completed before the

case was tried. The completion of that improvement terminated the trust under which the garnishee's manager testified that the money was placed in the garnishee's possession.

In stating that the undisputed proof shows that if any trust at all existed it was only for the purpose of securing the completion of the filling station, it has not been overlooked that some of the other witnesses testified that Mr. Huff, the representative of the refining company, who was soliciting subscriptions to the stock of that company, stated that the money which might be paid by citizens of Rosebud for stock in the company would be placed in the bank and used for the construction of the filling station. Such statements may have been made, and yet when the money was deposited in the bank, the undisputed proof shows that the deposit was made upon an express contract with the bank, as testified to by Mr. Donaldson, that it would not be withdrawn until the filling station was completed; and if such was the contract under which the deposit was made, and as the filling station has been completed, the garnishee bank owes the balance of the money so deposited to appellant, the Houston Bank, which has acquired all the rights the refining company had against the garnishee.

In fact, Mr. Donaldson testified that he told Mr. De Zavala that the money was placed in the garnishee bank with the express understanding that the Columbian Refining Company would leave it in the bank until the building was completed. Furthermore, in testifying about his agreeing to pay $2,100 on the original certificate of deposit, and issuing another for $2,000, he said:

"I agreed to release $2,100 of this and reserve the $2,000 to be held back until the filling station was completed, and he (Huff) assured me that was entirely satisfactory."

That testimony, given by the garnishee's agent and manager, who acted for it in all matters under consideration, constitutes, in legal effect, an admission by the garnishee bank that if any trust existed it was not for the purpose of securing all debts the Columbian Refining Company might incur in the erection of the filling station at Rosebud, but that it was for the benefit of the citizens of Rosebud who subscribed to the stock of that company, and its object was to secure the erection of a filling station, regardless of how or when the Columbian Refining Company paid for such station. It is quite clear that the object of the citizens of Rosebud who negotiated with Mr. Huff, the agent of the Columbian Refining Company, and purchased stock in that company, was to secure an additional improvement in Rosebud, without reference to how or when that improvement was paid for. The improvement has been made, and it was not shown that any

lien exists thereon; and if the agent of the Columbian Refining Company made a specific promise to the citizens of Rosebud referred to that it would use the money collected from them to pay every one who furnished labor or material for the construction of that improvement, no injury would result to such citizens by breach of that promise, because a failure to pay a debt due A. results in no legal injury to B., although the debtor may have promised B. that he would pay such debt to A. with money received from B.

The testimony does not support the finding of the trial court that the fund in question had been assigned to the plaintiff Sapp. The appellant, Houston National Exchange Bank, was no party to any transaction which occurred between the plaintiff Sapp and others concerning the fund in question, and therefore its rights previously acquired were not affected by what may have transpired among the refining company, the garnishee, and the plaintiff Sapp. Besides, the testimony as to what transpired between them fails to show any agreement to assign or create a lien upon that fund in behalf of Sapp. When analyzed, it merely amounts to this: When the question of giving bond was under consideration, Sapp, at the time of executing the bond to secure the refining company, inquired of the latter's agent how he (Sapp) would be secured, and the latter told him, in the presence of Mr. Donaldson, the agent of the garnishee, that the refining company had money on deposit in the garnishee's bank, for the purpose of paying for the filling station; and Mr. Donaldson, the garnishee's agent, confirmed that statement. Those statements may have misled Mr. Sapp, and induced him to sign the contract without any further guarantee for his protection, but it did not and could not assign to him the fund in question, which the refining company had already assigned to appellant.

The writer cannot concur with the holding in the majority opinion to the effect that appellant by accepting the $2,000 certificate of deposit, dated July 8, 1920, which was a few days after the plaintiff Sapp made his contract with the refining company, thereby lost all the rights it acquired by its former purchase of the original certificate of deposit for $4,100. While it is true that Mr. Donaldson stated to appellant that inasmuch as the $4,100 certificate stated on its face that it was not negotiable he did not recognize appellant as having any right to that certificate, although it was made payable to the order of the refining company and was indorsed by that company, he further testified that the original certificate was sent to his bank for payment; that he notified the Houston Bank that the claim would not be paid at that time; that he took the matter up with the refining company, and, among other things, he said:

"I wrote a letter up there and they (Houston National Exchange Bank) accepted the proposition; they accepted the $2.000 certificate and the $2,100 in cash was paid, and the $2,000 certificate was given as a basis for a compromise, and afterwards the certificate was sent to us. At the same time Mr. White came up and represented to me that they were going ahead and build the station and fulfill the contract and showed me evidence that they were shipping the stuff there. We first reached the agreement as to the payment of cash, and by way of compromise I gave them a new certificate, but I would not issue the second certificate until the first had been returned to me. * * *

"As to whether we got the $4,100 certificate when we arranged to settle, I will state that it was sent to us by the Houston National Exchange Bank. As to how we sent the new certificate, I will state I think we attached our draft for $2,100 and certificate of deposit payable to the order of the Columbian Refining Company. That's my recollection of the matter; I think the draft was made payable to the bank; we had to make it payable to them because it was sent to the bank."

The testimony given by Mr. De Zavala, who represented appellant, corroborates Mr. Donaldson's testimony, and, without repeating it here, shows clearly that the acceptance of the $2,000 certificate dated after the plaintiff Sapp had made his contract with the refining company, was accepted by appellant in furtherance of an agreement to extend the time for the payment of the balance due on the $4,100 certificate; the garnishee bank having paid to appellant $2,100 upon that certificate. True it is, the $2,000 certificate, like the original $4,100 certificate, was made payable to the order of the Columbian Refining Company; but, inasmuch as that company indorsed it to appellant, the writer fails to understand why that fact can adversely affect the interests of appellant. The majority opinion does not assign any reason for holding that by accepting payment of over half of the original debt owed by appellant, and extending time for the payment of the balance, appellant thereby surrendered any rights it acquired by its purchase of the original certificate, which purchase occurred before the plaintiff Sapp made any contract with the refining company.

Counsel for appellant also contend that, conceding the certificate of deposit sued on by appellant was a nonnegotiable instrument, the Houston Bank acquired it subject only to such defenses as the issuing bank had; and an assignment of that certificate to a purchaser before maturity, for value and without notice, was not subject to any equities or defenses residing in any third party. The rule that the purchaser of nonnegotiable paper takes it subject to defenses which might be urged against its assignor does not extend to or include defenses arising subsequent to the date of the assignment, nor does it include equities or defenses residing in third parties. Taylor v. Calloway, 7 Tex. Civ. App. 461, 27 S. W. 934; Stillson v. Stevens (Tex. Civ. App.) 23 S. W. 322; Welch v. Renfro, 42 Tex. Civ. App. 460, 94 S. W. 107; Ruling Case Law, vol. 2, pp. 629–632, inclusive. The last authority states:

"An assignee of nonnegotiable paper normally takes it subject to all equities, rights and defenses which could have been urged against it in the hands of the assignor at the time of the assignment.

"But the general principle that an assignee takes it subject to all equities which existed against the assignor, is generally understood to mean the equities residing in the original obligor or debtor, and not those residing in some third person against the assignor."

Before concluding, the writer deems it proper to say that he is not to be understood as holding that the testimony discloses that the fund in question was placed in the garnishee bank as a trust fund for the benefit of any one, and could not be withdrawn by the Columbian Refining Company, or its assignee, without the consent of the beneficiaries in the trust. In my opinion, if the testimony discloses any trust at all, it was for the benefit of the Rosebud subscribers to the stock of the refining company, and not for the benefit of those who might extend credit to the refining company for the construction of the filling station. If the filling station had never been constructed, and the refining company had notified the Rosebud subscribers to its stock that it would not make that improvement, it may be that their only remedy, if they had any, would have been an action for damages. However that may be, it seems quite clear to me that the evidence fails to disclose any trust in favor of any one who might thereafter, in whole or in part, construct the filing station. I cannot believe that it is a sound proposition of law that when one person sells property to another his statement or promise to the purchaser that he will use the money so received for a particular purpose fastens upon that fund a trust for the accomplishment of that purpose. It is true that an agreement between A. and B., based upon a sufficient consideration to the effect that B. will pay to C. a debt owing by A., is a valid contract, and may be enforced by C.; but this case does not come within that class. The result of the decision in this case is that when money is deposited in a bank, and the bank executes a written obligation to pay the same to the depositor or his order, that if the bank is notified that the depositor intends that the money referred to shall only be used to pay certain debts which the depositor expects to incur, a trust is thereby created in favor of such future creditors, then the bank cannot lawfully pay the money to the holder of its written obligation to pay it. Such holding,

it seems to me, is not only unsound, but if established as the law will result in much confusion and harm to the banking business. If it be said that in this case the bank orally consented to hold the money as a trust fund, my answer is that the contract between the bank and the depositor was reduced to writing, and by the written instrument, which constituted a promissory note, the bank did not agree to hold the money for the benefit of any one except the depositor and its assigns, but did promise to pay it to them. See First State Bank of Otto v. Cohn, 247 S. W. 923, recently decided by this court.

The writer regrets the extent of this opinion, which seems to have been necessary in order to properly present the reasons for his dissent, which the statute requires a dissenting judge to do.

### On Motion for Rehearing.

BLAIR, J. This opinion is on motion for rehearing. Chief Justice KEY having dissented to the majority opinion heretofore written by Mr. Justice JENKINS and concurred in by Mr. Justice BRADY, then a member of this court, and on this motion for rehearing both Chief Justice KEY and Mr. Justice JENKINS adhering to their former opinions, it therefore becomes necessary for the writer to participate in said motion. I do not agree with the majority opinion. I concur in the dissenting opinion.

This case was tried below before the trial judge, without a jury, and, upon request, he filed findings of fact and conclusions of law. There was also filed a statement of facts, prepared by the court reporter. The majority opinion adopted the findings of fact by the trial judge, with certain additional findings of their own, which were deemed necessary for a proper disposition of this case. The dissenting opinion adopted certain facts from the record as well as the findings of fact by the trial judge. There are certain portions of the additional findings of fact by the majority opinion that cannot properly be considered in this case, because some of the findings relate to a compromise, and some of the findings relate to immaterial matters in this case, since the beneficiaries to the trust agreement were not made parties to this suit. That portion of the additional findings of fact by the majority opinion, relating to a compromise, is as follows:

"The contract with Sapp for the erection of the filling station was made a few days prior to the issuance of the $2,000 certificate. (This finding is contrary to the finding of the trial judge, who found that it was made a few days after the contract to erect the filling station.) The Houston Bank, at the time the $2,000 certificate was issued, knew of the agreement of the refining company to leave the money paid by the citizens of Rosebud for stock in said company, in the Rosebud Bank, and to use the same in payment for the construction of the filling station, and for no other purpose."

The record shows that E. A. Donaldson, cashier of the Planters' National Bank of Rosebud, the secretary and president of the Columbian Refining Company, and appellant's agent, all testified that the transaction reducing the $4,100 certificate, assigned by the Columbian Refining Company to appellant, to a $2,000 certificate, was the result of a compromise. It is a rule as old as the law that evidence of a compromise cannot be considered, and it is inadmissible for any purpose. The trial court did not take the compromise evidence into consideration in his findings of fact, but the majority opinion seeks to do so, which is improper and is not binding upon appellant.

That portion of the additional findings by the majority opinion relative to Sapp's lack of knowledge of any claim of the Houston Bank on the money in the Rosebud Bank when he made the contract to erect the filling station is immaterial; also, the introduction of the $2,000 certificate, in so far as it aids appellee Sapp in proving his cause of action, is immaterial.

That portion of the additional findings by the majority opinion that E. A. Donaldson, cashier of the Rosebud National Bank, was one of the citizens of Rosebud who subscribed for stock in the Columbian Refining Company, under the agreement that the same should be deposited in said bank and expended in the construction of the filling station, is immaterial, because E. A. Donaldson was not made a party to this suit, and could not be bound by any judgment rendered herein.

The record discloses that appellee Sapp sought first to obtain a claim on the funds in question by reason of an ancillary writ of garnishment; but, upon being confronted with a legal assignment of the funds in question to appellant, he then sought to establish a trust estate, which he seeks to make himself an interested party to by reason of the alleged claim that he carried out the purposes for which the trust was executed; and further that certain acts done by the agents of the Columbian Refining Company, at the time he made his contract with them, constituted an assignment of the funds to him. It is not contended that the garnishment lien is prior to the assignment to appellant of the fund; therefore, appellee Sapp must recover by reason of his trust fund contention, or not at all. We will only discuss this feature of the case.

The trial judge before whom this case was tried based his conclusions of law authorizing a recovery by appellee Sapp against appellant upon two propositions of law, both of which must be sustained by the evidence, else the judgment cannot stand; that is, neither

proposition standing alone can support the judgment rendered. The two propositions are as follows:

First. That by virtue of the representations and agreements between the Columbian Refining Company and the subscribers of the stock, the proceeds thereof become a trust fund in the hands of the Planters' National Bank, which fund was agreed to be expended in the construction of a filling station at Rosebud; and the parties to said agreement had a right to demand that said fund be so applied, and the Houston Bank acquired such certificate of deposit subject to the carrying out of said agreement.

Second. That the transaction between the Columbian Refining Company and appellee Sapp amounted to an assignment of the trust fund to him.

As to the first proposition, if a trust was really created, it is not even contended that appellee Sapp was a party to the trust; nor was any beneficiary to the trust made a party to this suit; and appellee Sapp, in so far as this case relates, is not a party to the trust agreement, unless he became a privy party, by reason of the assignment by the Columbian Refining Company's agents in their verbal agreement to construct a filling station. Thus it is seen that both propositions must be established by evidence or this judgment fails. By the first, no privity of contract is shown in behalf of Sapp; and his claim to the fund failed, unless by some assignment he acquired a greater interest and a better title to the fund than the appellant, the Houston Bank, acquired by reason of the prior assignment to it of the certificate of deposit. That is, the assignment to appellee Sapp must so relate back to the original agreement of deposit that he will become privy thereto. It is therefore apparent that both propositions must be sustained to support the judgment.

Then, too, if appellee Sapp relies solely for recovery herein upon the existence of the trust agreement between the Columbian Refining Company and the citizens of Rosebud purchasing stock, in that the trust fund will inure to his use and benefit by reason of the construction of the filling station, he could not recover in this suit, for the reason that he has not made any of the beneficiaries parties to this suit; and the judgment rendered herein would be void but for the additional proposition that the transaction between the Columbian Refining Company's agent and appellee Sapp amounted to an assignment of the fund to him.

For, in the case of Duncanson et al. v. Howell (Tex. Com. App.) 222 S. W. 232, it is held that commissioners, in whom no title to the trust estate vested, were mere agents and not trustees, which proposition we will not discuss further in this case; but this same case also holds that a plaintiff, without any title or right to property held in trust, cannot bring a suit for the use and benefit of another having title.

In the case of Barcus v. Parlin-Orendorf Co. (Tex. Civ. App.) 184 S. W. 640, it is held that all parties interested in trust funds must be made parties to a suit for the recovery of such fund; else the judgment is void.

In the case of Jno. G. Williams v. Fort Worth & New Orleans Ry. Co., 82 Tex. 555, 18 S. W. 206, which is a case almost directly in point with this case both as to fact and purpose, it is held that the trustees and purchasers of the property are necessary parties to the suit, as well as the beneficiaries thereto. This rule is also announced in 39 Cyc. 606; 2 Perry, Trust and Trustee (6th Ed.) § 877; Hall v. Harris, 11 Tex. 300; Cotton v. Coit, 88 Tex. 414, 31 S. W. 1061.

Hence we must conclude that a judgment disposing of a trust fund estate without making both trustee and beneficiaries of the fund parties to the suit is void, and this case could not stand but for the fact of the additional claim of appellee Sapp that the funds were assigned to him by reason of the alleged transaction at the time he entered into the contract to erect the filling station.

This case having been tried upon the proposition that a trust agreement had been entered into as pleaded, we will discuss it in this light, although generally trust agreements do not reach to bailments, pledges, claims for money had and received which the law implies a promise to pay it back, and all kinds of deposits. These are generally considered, in effect, personal trusts, with which equity does not deal.

We will discuss trusts and their creation generally, and apply them to the facts in this case. A "trust" is an obligation in which the person holding the legal title is bound in equity to hold for the benefit of the beneficiaries or cestui que trust. A trust is created in two ways: First, by intentional act and agreement; and, second, by operation of law. The expressed trust, or one created by agreement, must contain three certainties, or no trust is created: First, the intention to create a trust and the purpose of creation; second, the property to which the trust attaches must be identified; and, third, the party to be benefited must be certain, and, if several, their respective portions must be certain. It is through these certainties that we reach the intention of the parties.

In view of the above, it is clearly shown that under the third certainty required to create a trust, that is, that the party to be benefited must be certain, prohibits appellee Sapp from claiming as a beneficiary of the trust; and no expressed trust was created for his benefit. Can it be said that he, by operation of law, became a beneficiary of the trust agreement between the Columbian Re-

fining Company and the parties who purchased the stock in Rosebud, Tex., by reason of having carried out the original purpose of the trust? Trust, by operation of law, arises as an inference from the condition under which a party acquires the title or possession of property, and may be classed, first, as a resulting or implied trust, and, second, as a constructive trust. A resulting or implied trust is one which the court infers the intention to create a trust from the act, such as taking title in the name of one for property purchased with the funds of another, the equitable title being held in trust; or as to surplus of the sale of real estate pledged to pay a debt above the amount of the debt; or in any case where property is acquired under such circumstances as the court may deem it equitable to read the intention to create a trust in the act.

Is this such trust that the court would read an intention in the act to make the appellee Sapp a beneficiary because he carried out the original purpose by performing the labor to erect the filling station? If so, then does not appellant stand in the same relation, since we find from the record that the president of the Columbian Refining Company informed the trustee, Planters' National Bank, several days before the contract was entered into with Sapp to build the filling station, that it had assigned the trust fund represented by the certificate for $4,100 to appellant; this being shown by a letter introduced by appellee Sapp, dated June 28, 1920, which letter in part states this:

"In order to purchase material for which we paid cash, we have disposed of the $4,100.00 certificate, and it is not now in our possession, and it is our judgment that you should recall and pay the same." Signed by W. A. Rogers, President of the Columbian Refining Company.

This was also called to the attention of the Planters' National Bank by another letter, signed by the secretary of the Columbian Refining Company, before the contract was entered into with appellee Sapp. Then neither party has any right in the trust fund by reason of a resulting trust; or both appellee Sapp and appellant have equal rights thereto, not taking into consideration the assignment to appellant.

The only other character of trust, by operation of law, is a constructive trust, and it being one arising out of fraud is not applicable to this case. So we must conclude that neither appellee Sapp nor appellant is a beneficiary in the trust fund, unless by reason of a resulting trust, and in which event both stand in equal relations (with the exception that appellant has an assignment of the fund), one having furnished the moneys with which to purchase the materials, and the other the labor to construct the filling station.

We cite the authorities under the above propositions of law relative to trusts and their creation as follows: Sears on Trust Estate; Simkins on Equity, pp. 146–168, and cases cited therein; Murphy Land Co. v. McKibben (Tex. Civ. App.) 221 S. W. 650; Guest v. Guest (Tex. Civ. App.) 208 S. W. 547; Allen v. Pollard, 109 Tex. 536, 212 S. W. 468; Baker v. Kennedy, 53 Tex. 200; Holland v. Shannon (Tex. Civ. App.) 84 S. W. 854; Vaello v. Rodriquez (Tex. Civ. App.) 218 S. W. 1082; Aaron Frank Clothing Co. v. Deegan (Tex. Civ. App.) 204 S. W. 471; Smalley v. Paine (Tex. Civ. App.) 130 S. W. 739.

The above cases are cited merely for the general law governing trusts. We do not find any case exactly in point with the case at bar, and it involves many perplexing questions.

This brings us to a discussion of the second proposition of law upon which the trial judge bases his judgment; that is, that the transaction between Columbian Refining Company and appellee Sapp amounted to an assignment of the trust fund to him. This is clearly an erroneous conclusion of the law under the facts in this case. To whom did the fund belong? Who had a right to make an assignment of the same? The trustee could not assign it; the beneficiaries of the trust might, under proper showing, assign it, but they are not made parties to this suit. Clearly the refining company could not assign it, for it had already assigned whatever interest it had to appellant. It is beyond reason to conceive how the Columbian Refining Company having parted title with whatever interest it may have had in the fund, by assignment to appellant, can again verbally assign it to appellee Sapp, and give to the second assignment a better title than it had given to the first. It would certainly be an admirable way for those of us owing debts to pay them, if this should become the law in Texas. The record clearly shows, and the trial court found, that the Columbian Refining Company had assigned whatever interest it had had in the fund to appellant by proper indorsement of the certificate for $4,100; said certificate being issued as a nonnegotiable instrument by the Planters' National Bank of Rosebud. But somebody must assign the fund, else appellee Sapp cannot recover. He is not beneficiary under the trust agreement; he does not take such by operation of the law of resulting trust; he has no proper assignment of the fund; he cannot recover herein.

Appellant had a legal assignment of the fund prior to any claim of appellee Sapp, either by garnishment or assignment. The trustee is not claiming that the fund should be assigned to appellee Sapp, neither are the beneficiaries. The beneficiaries are not parties to this suit. No claim is made that

either the trustee or beneficiaries had assigned any interest in the fund to appellee Sapp. The Columbian Refining Company could not assign the fund, because it had assigned whatever interest it had long prior to appellee's coming into the case. Appellant is entitled to recover.

It is therefore ordered that the judgment heretofore rendered affirming this case be and the same is hereby set aside, and the judgment of the court below is hereby reversed and rendered for appellant, Houston National Exchange Bank of Houston, and that it have and recover of and from the Planters' National Bank of Rosebud, Tex., the sum of $2,000, with interest to date of maturity of the deposit certificate at the rate of 3 per cent. per annum, and from and after that date at the rate of 6 per cent. per annum; and against appellee Sapp for all costs in this behalf expended.

Reversed and rendered.

JENKINS, J. (dissenting on motion for rehearing). I am somewhat at a loss to know how to treat the original dissenting opinion herein. This opinion was written by Chief Justice KEY, and inasmuch as he concurs in the opinion of the majority on rehearing, it may be that the original dissenting opinion is of no further force herein. However, I will refer to the same briefly.

That opinion sets out at considerable length the testimony in the case, from which there is an apparent conclusion that the only trust relation between the original contributors to the fund which was deposited in the bank and the bank itself was that it was to hold such fund in trust until the filling station was completed, and that it having been completed the trust ceases.

The trial court found on this issue as follows:

"It was understood and agreed between the agents of Columbian Refining Company and said Rosebud purchasers of stock that their money would all be used in the erection of said filling station, and that none of said money would leave said town, but would be deposited in the Planters' National Bank, and kept there. until paid out for the construction of said filling station."

The original opinion herein approved this finding of fact by the trial court. The testimony as quoted in the original dissenting opinion shows that the finding of the trial court is not only sustained by the evidence, but that there was no evidence to the contrary. For instance, O. C. Hughes, one of the subscribers, testified as follows:

"The representations that he (agent of the Columbian Refining Company) made to the prospective purchasers of that stock was that the money was to be used to put in a filling station there (Rosebud). * * * He told us to put in as much as we could; so much money and they would take hold of it and put in the balance of it. He said not a nickle would leave town, but would be deposited in the Planters' National Bank, and that we would see it spent right there on the corner, and not one cent of it would leave town."

E. A. Donaldson, one of the subscribers, testified:

"He (agent of the refining company) said he would like to leave the money there as an evidence of good faith with the stockholders in the town, and it would not be drawn out, only for the purpose of erecting a station. * * * He got up before the Commercial Club and made a bunch of utterances that the money would not leave the town."

Roy Gaither, another of the subscribers, testified as follows:

"At that time (when he subscribed) Mr. Huff (the agent) stated to me that the money would be placed in the Planters' National Bank, and would be expended in the building of the station."

The majority opinion on motion for rehearing does not disagree with the finding of the trial court on this issue, but states that the original majority opinion adopted certain additional findings which are deemed immaterial. It also states that the finding in that opinion that the "contract with Sapp for the erection of the filling station was made a few days prior to the issuance of the $2,000 certificate" is contrary to the finding of the trial judge, who found that it was made a few days after the contract to erect the filling station.

The trial court seems to have so found, but it is apparent that the question as to the contract being let to Sapp prior to the issuance of the new certificate was not a matter which the court was considering. After reciting the transactions which led up to the issuance of this $2,000 certificate, the trial court found:

"Thereafter the Columbian Refining Company, having purchased and shipped material to Rosebud for the construction of said station, a part of said fund was paid out and a new certificate for the balance of $2,000 was issued in the name of the Columbian Refining Company, and forwarded to the Houston National Bank. The Columbian Refining Company then entered into a contract with plaintiff T. M. Sapp, for the erection of the filling station."

The undisputed testimony is that this contract with Sapp was made on July 3, 1920. The $2,000 certificate was issued, as shown by the record, July 8, 1920.

The original dissenting opinion and the majority opinion herein on motion for rehearing are based upon the proposition that the trust agreement with the original subscribers was only to the extent that the money would remain in the bank until the

filling station was erected, and that the station having been erected prior to the institution of this suit, the trust in favor of the subscribers ceased. As shown by the findings of the trial court and the undisputed testimony, the agreement with the original subscribers was not only that the money should be deposited in the bank to secure the erection of the filling station, but that it should be used in payment for the erection of such station, and for no other purpose. But it is contended, in both the original dissenting opinion and in the present majority opinion, that Sapp cannot enforce this trust, for the reason that he was not one of the subscribers; therefore not a party to such agreement. The opinion of the writer on this point as well as that of Mr. Justice BRADY, who was then a member of this court, is fully expressed in the original majority opinion herein, which may be summarized as follows:

The agreement between the agent of the refining company and the stockholders was that the money should be placed in the bank, and by the bank held in trust for the purpose of paying for the erection of the filling station. The contract not having been let when this agreement was made, the effect of the agreement was that the deposit should be held in trust for the benefit of the contractor when he became known, and it was certain that the contractor would become known, if the refining company complied with its agreement to let such contract. When the contract was let, the trust inured to the benefit of the contractor, as contemplated in the original agreement. The bank accepted the original deposit with the express agreement that it would hold the same, and not pay it out except in payment for the erection of the filling station. There is no controversy in the evidence on this point as to the original agreement with the subscribers. E. A. Donaldson, the cashier of the bank, testified as to the original certificate as follows:

"This certificate was issued with the express understanding that the money would be used before the expiration of the certificate, to construct a filling station at this place."

He so informed the Federal Reserve Bank, which held this certificate for collection; and he so informed Mr. De Zavala, the representative of the appellant herein, prior to the issuance of the $2,000 certificate.

Reference is made in both the original dissenting and the majority opinion on rehearing to the fact that the trust agreement herein could not be enforced, for the reason that the original subscribers were not parties to this suit. It is not necessary to make any one a party to a suit who is not adversely interested. The original subscribers are not adversely interested to Sapp, nor to the bank, the trustee, nor to the appellant herein.

They were not claiming the money, and the enforcement of the trust agreement could in no wise be detrimental to them. The uncontradicted evidence shows that at the time the $2,000 certificate here in controversy was issued, the appellant knew that the $4,100 subscribed by the Rosebud citizens had been placed in the Rosebud Bank, upon the express agreement that the same would be used in paying for the erection of the filling station, and for no other purpose. The majority opinion on rehearing herein treats this as immaterial, for the reason that this $2,000 certificate was issued as the result of a compromise. I quote from said opinion as follows:

"It is a rule as old as the law that evidence of a compromise cannot be considered, and is inadmissible for any purpose."

This language is not aptly chosen. There is a rule of evidence that statements and admissions made with the view of a compromise are not admissible against a party making them, but it is a rule of law as old as the law that compromise when fairly made is binding on the parties thereto.

"Numerous authorities support the doctrine that a compromise and settlement of a controversy based on sufficient consideration is as between the parties thereto, and as to the matters embraced therein, binding and conclusive when fairly made." 8 Cyc. 518.

Compromises are favored by courts. "Agreements of compromise may be impeached for any cause sufficient in equity to invalidate a contract" (8 Cyc. 573), but not otherwise.

The evidence as to the compromise in this case may be briefly summarized as follows:

The original certificate of $4,100 was issued to the Columbian Refining Company, and it transferred the same to the appellant, for a valuable consideration. This certificate stated, upon its face, that it was nontransferable. Hence, while the Houston Bank became the owner of this certificate, it took it subject to all defenses that could be made against the refining company.

It seems clear to me that if the refining company had demanded the payment of this $4,100, the Rosebud Bank should have refused to pay the same until the filling station was erected and paid for. Such being the case, the Rosebud Bank very properly refused to pay the Houston Bank this money. Thereupon there was considerable correspondence and telegraphic communication between the Rosebud Bank and the Houston Bank, the former notifying the latter that this money was held in trust, as hereinabove stated, and that it did not recognize said Houston Bank as having any interest in the matter. While this controversy was pending, the refining company bought and paid for $2,100 of material to be put into the fill-

ing station, and the same was delivered at Rosebud. This did not obligate the Rosebud Bank to pay out any part of the $4,100, for the reason that the same was not payable until the station was completed. By agreement between the Rosebud Bank, the Houston Bank, and the refining company, the Houston Bank surrendered this $4,100 certificate; the Rosebud Bank paid the refining company $2,100, which the Houston Bank received and agreed to issue a $2,000 certificate for the balance to the refining company, conditioned as was the former certificate. This was agreed to by all parties as a compromise of the controversy. The $4,100 certificate was surrendered and cancelled; the Rosebud Bank issued the new certificate for $2,000 to the Refining Company, which the Refining Company transferred to the Houston Bank. At this time the contract had been let to Sapp, and the Rosebud Bank had agreed to hold this $2,000 and pay it to Sapp upon the completion of the filling station. It is immaterial that the Houston Bank did not know that the contract had been let at that time. It had agreed that the new certificate should be issued to the Refining Company. Under this state of facts, it seems clear to me that the judgment of the trial court was correct in holding that the bank held this $2,000 in trust for Sapp, regardless of what might have been the relation of the Houston Bank to the deposit prior to this compromise agreement.

The last majority opinion states that the judgment of the trial court must rest upon both of two propositions of law, and that neither proposition standing alone can support the judgment. The propositions referred to, as stated by the court, are as follows:

"First: That by virtue of the representations and agreements between the Columbian Refining Company and the subscribers of the stock, the proceeds thereof became a trust fund in the hands of the Planters National Bank, which fund was agreed to be expended in the construction of the filling station at Rosebud; and the parties to said agreement had a right to demand that said fund be so applied, and the Houston Bank acquired such certificate of deposit subject to the carrying out of said agreement.

"Second: That the transaction between the Columbian Refining Company and appellee Sapp

252 S.W.—21

amounted to an assignment of the trust fund to him."

I do not think that the judgment of the trial court rests necessarily upon the finding that the transaction, at the time Sapp entered into the contract, amounted to an assignment of this $2,000 to him. It was not an assignment in any technical sense, for the money did not become his by virtue of the contract, but it did create a trust relation between him and the bank, by virtue of which he would become entitled to this money upon completion of the contract. The opinion referred to states that an assignment to Sapp would not be effective, because of the prior assignment to the Houston Bank. As previously stated herein, the original assignment to the Houston Bank was subject to the trust of which Sapp became the beneficiary when he entered into the contract, even had no compromise settlement been made; but the certificate herein sued on was issued under circumstances as herein related, which clearly constituted the $2,000 trust fund for the benefit of Sapp. At least two of the subscribers were present when the contract was let to Sapp, and knew of and assented to the agreement that the $2,000 should be paid to him. It was not necessary that any of them should have assented to this, for it was only carrying into effect by the bank the original agreement with the subscribers.

For the reasons stated, the case of Barcus v. Parlin-Orendorf Co. (Tex. Civ. App.) 184 S. W. 640, cited in the opinion referred to, is not in point. Neither is the case of Duncanson v. Howell (Tex. Com. App.) 222 S. W. 232, cited in said opinion, applicable to the facts of this case. The same applies to the other authorities upon this point cited in the said opinion on motion for rehearing.

The general discussion in the last majority opinion, in reference to resulting and implied trusts, and the numerous authorities cited, "like the flowers that bloom in the spring, tra la, have nothing to do with the case," for the reason that the trust created in this case is an express trust.

For the reasons stated, I dissent from the last majority opinion herein, and reassert the conclusion reached in the original majority opinion, that the judgment of the trial court should be affirmed.